HANCOCK INDUSTRIES and Ace Service Corp. and Eastern Waste Removal and Charles Crumbley, Inc. and Edward Lawrenson, Inc.

v.

Erik J. SCHAEFFER, individually and in his official capacity as Executive Director of Chester County Solid Waste Authority and County of Chester, et al.

Civ. A. No. 85–3158.

United States District Court, E.D. Pennsylvania.

Aug. 5, 1985.

Michael F.X. Gillin, Halligan & Gillin, Media, Pa., for Victor Petaccio and Delaware County Incinerator (Solid Waste) Authority.

Nolan N. Atkinson, Jr., Philadelphia, Pa., for plaintiffs.

Joseph A. Tate, Stephen D. Brown, Alison M. Benders, Schnader, Harrison, Segal & Lew, Philadelphia, Pa., for J. Erik Schaeffer and Chester County Solid Waste Authority.

Francis P. Connors, Co. Sol., Michael J. Ehling, Asst. Co. Sol., Media, Pa., for County of Delaware.

## FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

HUYETT, District Judge.

Plaintiffs, five in number, have filed this action against the Chester County and Delaware County Solid Waste Authorities, the respective executive directors, Chester County and Delaware County seeking injunctive as well as monetary relief from the alleged infringements committed by defendants. Each plaintiff is a commercial trash hauler engaged in the collection and transportation of commercial trash from the City of Philadelphia.

Defendant Chester County Solid Waste Authority ("Chester Authority") owns and operates the Lanchester Landfill while the Delaware County Incinerator (Solid Waste) Authority ("Delaware Authority") owns and operates the Colebrookdale Landfill located in Berks County. In a memorandum dated March 29, 1985, J. Erik Schaeffer, the executive director of the Chester Authority and a defendant in this action, advised all haulers that there was a possibility that due to the high volume of trash being dumped, out-of-county trash would not be accepted at the Lanchester Landfill after June 30, 1984; the only exception noted was the long-term contracts for LARA (Lancaster County) and the City of Philadelphia. By notice dated April 17, 1985, Victor Petaccio, executive director of the Colebrookdale Landfill, advised the public that the Colebrookdale Landfill would be closed as of May 31, 1985 and the landfill would be reserved for the needs of Delaware County.

Plaintiffs contend that the closure of these landfills violated their rights to equal protection and due process as guaranteed by the fourteenth amendment. Plaintiffs further contend that defendants' actions violate sections one and two of the Sherman Act, 15 U.S.C. §§ 1 and 2 and section two of the Clayton Act, 15 U.S.C. § 13.

Plaintiffs filed this action on June 4, 1985. On that date, counsel for plaintiffs, Mark Lipowicz, appeared before me seeking a temporary restraining order. At the time, the Colebrookdale landfill had closed but there were approximately four weeks remaining before the Lanchester Landfill was scheduled to close. I denied plaintiffs' request for a TRO and ordered counsel to meet with the defendants to try to reach an agreement.

On June 26, 1985, after evidently making little effort to resolve this matter amicably, plaintiffs renewed their request for a preliminary injunction hearing. In my absence, Judge Pollak as emergency judge met with the parties on June 27. An agreement was reached that the status quo would be maintained at least through July 2. I held a hearing in Reading on July 5, 1985 at which all parties had an opportunity to present evidence. In addition to plaintiffs' motion for a preliminary injunction, I also considered defendants' motions to dismiss or in the alternative for summary judgment. Plaintiffs had also filed a Rule 56(f) motion seeking additional time for discovery before I ruled on defendants' summary judgment motions.

For the reasons outlined below and in my bench opinion of July 5, 1985, and as set forth in my order of July 8, 1985, I conclude that plaintiffs' motion for a preliminary injunction must be denied and defendants' motion for summary judgment granted in part.

## FINDINGS OF FACT [1]

1. I incorporate in my findings of fact all those facts to which the parties have stipulated. These include the stipulation of facts relating to defendants Erik Schaeffer and Chester County Solid Waste Authority with the exception of paragraphs 12, 16, 21, and 33 and the stipulation of facts relating to defendants Delaware County Incinerator (Solid Waste) Authority and Victor Petaccio

---

1. The following constitute my findings of fact pursuant to Fed.R.Civ.P. 52(a).

with the exception of paragraphs 6, 11, 13, and 20.

2. James Lawrence Boling testified on behalf of the Chester County defendants in a candid and forthright manner and I therefore found him to be a credible witness.

3. Mr. Boling presently serves as the Chairman of the Chester Authority.

4. Chester County formed the Chester Authority on August 20, 1984 pursuant to its obligation under the Solid Waste Management Act, 35 P.S. § 6018.101 ("Solid Waste Act") to provide for the collection, transportation, processing, and disposal of municipal waste.

5. Chester County has guaranteed any default on Chester Authority's bonded debt by the full faith and credit of the County.

6. The Chester Authority was empowered to operate a landfill and to finance its operation.

7. At the time the Chester Authority purchased the Lanchester Landfill, approximately one-half of the trash dumped at the landfill was from outside Chester County.

8. At the time Chester Authority purchased the Lanchester Landfill, the landfill had an expected life expectancy of 15 years.

9. At the time Chester County purchased the Lanchester Landfill, daily tonnage of trash was 1,700 tons. The plan at that time was that disposal would never exceed 2,200 tons per day.

10. Starting in October and November the daily tonnage the landfill accepted started to rise. The rise continued after the Kinsley Landfill in New Jersey closed to Philadelphia trash and peaked at about 4,000 tons per day in March.

11. As of July 5, 1985, Lanchester Landfill is receiving approximately 3,300 to 3,400 tons per day.

12. As the tonnage started to increase through the late fall and early spring, the Chester Authority became increasingly concerned about the volume and the landfill's ability to handle it.

13. Lanchester Landfill employees were unable to keep up with the volume of trash; they could not spread and compact the trash at the same rate as the trash was being disposed. Maintenance and environmental hazards increased for this reason.

14. Lanchester Landfill has established minimum tonnages as a tool to control the expected per day tonnage.

15. The Chester County Authority acted independently of Chester County when it decided to close the Lanchester landfill to out-of-county trash.

16. John Erik Schaeffer testified at the hearing on July 5, 1985. Because Mr. Schaeffer testified in an open and straightforward manner, I found him to be a credible witness.

17. When the Lanchester landfill started accepting more than the optimal 1,700–2,200 tons of trash per day, Mr. Schaeffer recommended to the authority that they exclude out-of-county trash.

18. At the time he recommended the closure of Lanchester, Mr. Schaeffer was unaware of plans to close the Colebrookdale Landfill.

19. At the rate the landfill was being used in late 1984 and early 1985, the Lanchester would be full in seven years.

20. After the landfill is closed, the Chester Authority will continue to be responsible for its care for 15 years.

21. Lanchester Landfill has continued to accept certain high-priced residuals such as asbestos from outside of Chester County.

22. Mr. Victor Petaccio testified on behalf of himself and the Delaware Authority. He is the general manager of the Colebrookdale Landfill.

23. Mr. Petaccio testified in an honest and candid manner and I found him to be a credible witness.

24. The "comfort zone" or the amount of trash the Colebrookdale Landfill can handle on a regular daily basis is approximately 900 tons.

25. Prior to the June 1, 1985 closure of Colebrookdale landfill to out-of-county trash, the landfill was receiving between 26,000 tons and 27,000 tons per month or about 1,400 tons daily.

26. Delaware County is responsible for the disposal of trash from 45 municipalities.

27. The county owns two transfer stations through which all trash collected within the county must be funnelled.

28. Presently, the Colebrookdale Landfill receives Delaware County trash only from the Chester Township transfer station.

29. Trash currently collected at the Marple Township transfer station will be deposited at the Colebrookdale landfill starting in February 1987 when the contract providing for dumping at the Pottstown landfill expires.

30. Approximately one half of the Colebrookdale landfill is an old, unlimed depository of old trash. The landfill is in the process of excavating this old trash to rebury it after properly processing it.

31. If the landfill is forced to accept an increased volume of trash such as that caused by the dumping of out-of-county trash, it will have to divert manpower and resources from the excavation project which will serve to heighten the environmental risks posed by the unlimed portion of the dump.

32. At the time the Delaware Authority purchased the Colebrookdale landfill, the life expectancy of the landfill was three and one-half years.

33. The notice defendant Victor Petaccio circulated on behalf of the Delaware Authority advising the public of the closure of Colebrookdale Landfill stated that "[i]t is essential to preserve already limited capacity for the Delaware County waste stream and control costs of operation which have recently increased sharply because of new and higher expenses incurred to manage the landfill."

## DISCUSSION

The granting or denial of a request for preliminary injunction is ordinarily discretionary with the trial judge. This discretion is necessary because of the "infinite variety of situations which may confront" the court. *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 763 (3d Cir.1971). A preliminary injunction is an extraordinary and drastic remedy. The power to issue an injunction must be used sparingly, and relief should not be granted except in rare instances in which the law, the facts, and equities are clearly in the moving party's favor. *See* Wright & Miller, Federal Practice & Procedure, § 1848, at 428–29 (1973).

To prevail on a motion for a preliminary injunction, the moving party must demonstrate: (1) that he is likely to prevail on the merits of the controversy, and (2) that he will be irreparably harmed *pendente lite* unless the motion is granted. In addition, the court should take into account, when relevant, (1) the possibility of harm to other interested parties from the grant or denial of the injunction, and (2) the public interest. Essentially, the court must balance the existing interests. *Oburn v. Shapp*, 521 F.2d 142, 147–8 (3d Cir.1975).

Summary judgment may only be granted when it has been established that there is no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Small v. Seldows Stationery*, 617 F.2d 992 (3d Cir.1980). The court does not decide issues of fact, but merely determines if there is an issue of fact to be tried. *Ettinger v. Johnson*, 556 F.2d 692 (3d Cir. 1977). The facts must be viewed in the light most favorable to the non-moving party and any reasonable doubt as to the existence of a genuine issue of fact is to be resolved against the moving parties. *Continental Ins. Co. v. Bodie*, 682 F.2d 436 (3d Cir.1982).

Rule 56(f) of the Federal Rules of Civil Procedure provides that:

Should it appear from the affidavits of a party opposing the motion that he cannot

for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just. Pursuant to this rule, the correct procedure for a party opposing a motion for summary judgment who seeks discovery before a ruling on the motion is issued is for that person to file an affidavit setting forth the reason why such discovery is needed and in particular, what facts material to his position are unavailable to him without that discovery. In this case, plaintiffs failed to file the requisite affidavits but I will treat their motion and the comments made at the hearing on July 5, 1985 as the equivalent of a Rule 56(f) affidavit.

█ It is within the trial court's sound discretion to determine whether the reasons the party presents are sufficient to warrant the continuance of the motion. *See Mid-South Grizzlies v. National Football League,* 720 F.2d 772 (3d Cir.1983). Although it has been repeatedly held that a continuance of a motion for summary judgment pursuant to Rule 56(f) should be granted almost as a matter of course, important exceptions to this rule have been recognized. In *Mid-South Grizzlies,* 720 F.2d at 780, the Third Circuit, holding that the summary judgment motion was ripe for decision without additional discovery, noted that the plaintiffs' Rule 56(f) motion was based on pure speculation and raised merely colorable claims that actual or potential competition could be shown. Similarly, the court in *United States v. Donlon,* 355 F.Supp. 220 (E.D.Del.), *aff'd,* 487 F.2d 1395 (3d Cir.1973), held that defendant Dolon's bare assertion that there were facts which would establish his position which were in the exclusive control of the government did not bring him within the purview of Rule 56(f). "The court cannot deny the government's motion for summary judgment on Dolon's sheer conjecture." Therefore, the court must determine whether the party seeking the extension is able to present adequate need for it or whether the party is merely speculating about what might be uncovered through discovery.

## Equal Protection

Plaintiffs contend that defendants' actions in closing the Lanchester and Colebrookdale Landfills to out-of-county trash violate the equal protection clause of the fourteenth amendment. Plaintiffs claim that the classification of trash by geographic origin is unreasonable and arbitrary and therefore discriminatory and unconstitutional.

Because there is no suspect classification involved and plaintiffs do not have a fundamental right to engage in their businesses, defendants' must merely show that there is a rational relationship between the classification and a legitimate state interest. Chester Authority produced the testimony of Mr. Boling and Mr. Schaeffer who both testified that the authority decided to close the Lanchester Landfill to out-of-county trash to ensure that the landfill was operated safely given its current capacity and that the landfill would not be exhausted prematurely. Similarly, Delaware Authority produced the testimony of Mr. Petaccio, Executive Director of the Colebrookdale Landfill, who testified that the closure was necessitated by the increased environmental hazard caused by the excess dumping and the increased rate at which the landfill was being filled. Plaintiffs were unable to produce any evidence to refute the testimony of these witnesses or to elicit any different facts upon cross-examination.

I am persuaded for purposes of plaintiffs' preliminary motion that defendants' position that closure of the respective landfills to out-of-county trash is rationally related to preserving the landfills for county residents and ensuring that a safe level of operation is maintained is correct. Both counties and their respective authorities are under a statutory obligation to provide for the disposition of all solid waste generated within the county, and as Frank Fair, Chief Operating Officer for the Department of Environmental Resources, Region

III would have testified, the operator of the landfill is believed to be in the best position to judge the proper rate of acceptance of waste. Moreover, the cases upon which plaintiffs rely, *Lutz v. Armour*, 395 Pa. 576, 151 A.2d 108 (1959) and *Municipality of Monroeville v. Chambers Dev.*, 491 A.2d 307 (Pa.Commwlth.1985) must be distinguished on the fact that the municipalities in these cases were there excluding all out-of-county trash from being dumped anywhere in the municipality or were regulating the operation and use of privately owned landfills. Here, the authorities own the landfills and are simply regulating the use of their own facilities.

I will, however, decline to enter judgment at this time in favor of the defendants as to plaintiffs' equal protection claims in order to allow plaintiffs' additional time to conduct discovery into the basis for the decisions to close the landfills. At the hearing, testimony was adduced to the effect that at least the Lanchester Landfill is still accepting certain high priced trash items from outside the county including asbestos. Although plaintiffs have not convinced me that the Chester Authorities' decision to continue to accept such items while discontinuing receipt of other trash is not rationally related to its interest in preserving the landfill for the county residents for purposes of their preliminary injunction motion, I believe that plaintiffs are entitled to conduct discovery on this issue. When discovery is complete, defendants should renew their motions for summary judgment.

### Due Process

Plaintiffs contend that defendants' actions in closing the two landfills to out-of-county trash violate their due process rights. Plaintiffs argue that defendants in purportedly exercising their police powers and closing the two landfills violated the public policy of the Commonwealth of Pennsylvania and therefore the due process rights of the plaintiffs. In support of this position, plaintiffs contend that the Solid Waste Management Act, 35 P.S. § 6018.101 *et seq.* requires area-wide planning and that

by closing the landfills to out-of-county trash, defendants have violated the policy.

■ The Fourteenth Amendment to the United States Constitution states in pertinent part: "nor shall any State deprive any person of life, liberty or property, without due process of of law." Therefore, to constitute a due process violation, defendants' actions must have implicated plaintiffs' interests in life, liberty or property. Plaintiffs have failed to identify of which interest they are allegedly being deprived, but it is clear that neither plaintiffs' life or liberty interests have been implicated. Therefore the question is whether plaintiffs have a property interest in continuing to haul trash from outside Chester County to Lanchester Landfill to trash from outside Delaware County to the Colebrookdale landfill. I conclude that they do not.

Plaintiffs started to dispose of trash they haul at the two landfills in question in the latter quarter of 1984 after the Kinsley landfill in Deptford, New Jersey was closed to Philadelphia trash. No long-term contracts were ever signed between plaintiffs and the defendant solid waste authorities; rather, plaintiffs have operated with defendants on the basis of short-term agreements which defendants chose not to renew at the time they expired. Furthermore, there is no statutory provision which guarantees plaintiffs the right to continue to dump out-of-county trash at these two landfills.

■ To have a property interest protectible by the due process clause, a party must have a legitimate claim of entitlement to the benefit which is more than a desire for it or a unilateral expectation of it. *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). Property interests "... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Plaintiffs had nothing more than a unilateral expectation that they would be able to continue to

dump at the Lanchester and Colebrookdale landfills; therefore, there was no property interest giving rise to a due process claim. There are no genuine issues of material fact, and I do not believe that discovery will enable plaintiffs to produce any additional facts to support their position. Accordingly, judgment may be entered in favor of defendants and against plaintiffs as to plaintiffs' due process claim.

*Antitrust*

Plaintiffs also contend that defendants' actions in closing the landfills are anticompetitive and constitute violations of sections one and two of the Sherman Act and section two of the Clayton Act. Relying on a line of cases in which the state courts have held that municipal authorities are independent entities are not agents of the municipalities that create them, plaintiffs argue that there has been a conspiracy or combination between each authority and its respective county. For instance, plaintiffs claim that within one month of the purchase of the Colebrookdale landfill, Delaware Authority entered into an agreement with Delaware County to close the landfill to out-of-county trash. (Memorandum, at 20–21). Plaintiffs further argue that there is evidence that there was a conscious parallelism between the actions of the two authorities. These combinations, plaintiffs contend, constitute restraints of trade.

■ Because I conclude both that defendants are immune from antitrust liability pursuant to the doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and that even if they were not, their actions would not be violative of the federal antitrust laws, I will deny plaintiffs' request for a preliminary injunction based on their antitrust claims. Moreover, I do not believe that there are any facts essential to plaintiffs' position which warrant additional discovery for purposes of Fed.R.Civ.P. 56(f) and warrant my delaying ruling on defendants' motions for summary judgment as to plaintiffs' antitrust claims. Accordingly, judgment shall be entered in favor of all defendants and against plaintiffs as to the antitrust claims.

■ In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Court established an exemption from antitrust for state action. Relying on the principles of federalism and state sovereignty, the Court ruled that the Sherman Act was intended only to prohibit private restraints on trade, not anticompetitive conduct of a state acting through its legislature. *Id.* at 350–1, 63 S.Ct. at 313–14; *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985). Municipalities may also be entitled to antitrust immunity if their actions are authorized by state policy on the theory that the municipality becomes "an instrumentality of the State for the convenient administration of government within [its] limits." *City of Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 413, 98 S.Ct. 1123, 1136–37, 55 L.Ed.2d 364 (1978).

In the most recent case in the development of the *Parker v. Brown* doctrine, *Town of Hallie v. Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Court held that before a municipality will be entitled to the protection of the state action immunity, it must show that it was "engaging in the challenged activity pursuant to a clearly expressed state policy." *Id.* 105 S.Ct. at 1717. The specific question the *Hallie* Court addressed for the first time was how clearly the state policy must be articulated before a municipality can show that its anticompetitive activity constitutes state action. The Court concluded that once a municipality is authorized to act to perform a particular governmental function, it is immune from antitrust liability if the resulting anticompetitive effects would logically flow from this authority.

In *Hallie,* the Court ruled that a Wisconsin municipality acting pursuant to a Wisconsin statute authorizing cities to construct and maintain sewage systems, was exempt from liability under the Sherman Act. The City of Eau Claire had built a sewage treatment facility within the Eau

Claire Service Area that included the plaintiff towns; the facility was the only one available to the plaintiffs. The City of Eau Claire refused to supply sewage treatment services to the Towns but agreed to supply sewage treatment to individual landowners in these towns if a majority of the landowners in an area voted to have their homes annexed by the City and voted to use the City's sewage collection and transportation services. Plaintiffs contended that they were potential competitors in the collection and transportation of sewage and that the city's actions in using its monopoly over sewage treatment to gain a monopoly over the provision of sewage collection and transportation was a violation of federal antitrust laws.

Noting that the state statute authorized the city to provide sewage systems and to determine the areas to be served, the Court concluded that the anticompetitive effects of which plaintiffs complained flowed logically from the state grant of authority to regulate the use of the sewage system. Therefore, the City of Eau Claire was entitled to state action exemption from antitrust liability.

Similarly, the Chester and Delaware Authorities have acted pursuant to the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.101 *et seq.* in purchasing and operating the respective landfills.[2] Determining that improper and inadequate solid waste practices create public health hazards, environmental pollution and economic loss and cause irreparable harm to the public health, safety and welfare, the Legislature passed this act to establish a comprehensive plan for the management of solid waste within the Commonwealth. The Act provides that each municipality, which is defined to include counties and authorities, § 6018.103, is responsible for the collection, transportation, processing and disposal of municipal waste which is generated or present within its boundaries. § 6018.202(a). To this end, each municipality must

implement an approved plan for the handling, including disposal, of wastes. Moreover, each municipality may adopt ordinances, regulations, and standards for the storage and collection of wastes and may make waste disposal a public function. To satisfy these statutorily imposed obligations, both Chester and Delaware Counties decided to create authorities pursuant to the Municipality Authorities Act of 1945, 53 P.S. § 306 *et seq.,* to administer the solid waste plans. Each authority is empowered to acquire and operate solid waste disposal facilities for the respective county. Pursuant to this power, Chester Authority purchased the Lanchester Landfill and the Delaware Authority purchased the Colebrookdale Landfill. The authorities then, acting independently of one another and of the respective county administrations, decided that circumstances necessitated the closing of the landfills to out-of-county trash. The question presented is whether the closing of the landfills by the authorities and the resulting anticompetitive effect, if any, was a foreseeable, logical consequence of the power vested in the authorities by the State legislature in the Solid Waste Management Act. I conclude that it is and that therefore defendants are entitled to immunity from antitrust violation.

The Solid Waste Management Act reflects a clearly articulated state policy requiring the organized collection and disposal of solid wastes generated within a municipality. The Legislature determined that the municipality, including the county and the authority was in the best position to effectuate the Commonwealth's goals. Each defendant authority has determined that in order to best serve the county for which it was created it must close its landfill to out-of-county trash. Closure of the landfills is a logical consequence of the state created power and obligation of a municipality to provide for the disposal of its own waste.

---

**2.** I have considered Delaware County defendants' motion for abstention pursuant to the doctrine of *Railroad Comm'n. of Texas v. Pullman*

*Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and have concluded that abstention is not required in this instance.

Plaintiffs contend that defendants are not immune from antitrust violations because the closure of the landfills to out-of-county trash contravenes the state policy in regionalization and area-wide planning. Plaintiffs' memorandum, at 18. Plaintiffs argue that the Act "emphasizes cooperative and comprehensive planning" on an "area-wide" or regional basis. In support of this proposition plaintiffs point to sections 102(1) and 104(3) of the Act and a recent decision by the Commonwealth Court in *Municipality of Monroeville v. Chambers Development Corp.*, 491 A.2d 307 (Pa.Comwlth.1985). Although these provisions do speak in terms of area-wide planning, there is no definition provided as to what shall constitute an area. Section 201(b), 35 P.S. § 6018.201(b) sheds the only light on this issue when it says "[e]ach municipality ... shall submit to the department an officially adopted plan for a municipal waste management system or systems serving the areas within its jurisdiction." From this provision, one can conclude that the legislature had in mind municipal or county-wide planning. Chester and Delaware Counties have engaged in exactly this: county-wide planning. Moreover, the entire thrust of the Solid Waste Management Act is towards placing an obligation on the municipality to provide for the collection, processing and disposal of trash and taking whatever steps are necessary to fulfill this obligation.

■ Even if defendants were not entitled to immunity from antitrust liability, plaintiffs' claims fail. Plaintiffs' first claim is pursuant to section one of the Sherman Act which prohibits any contract, comination or conspiracy in restraint of trade. There has been simply no evidence of any contract, combination or conspiracy, and a refusal to deal without collusive action does not give rise to a violation of the Sherman Act. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Noting that authorities are independent entities and not the agents of the municipalities which create them, *see In Re Municipal Authority of Upper St. Clair*, 184 A.2d

695, 408 Pa. 464 (1962), plaintiffs contend that there has been concerted activity between Chester Authority and Chester County and between Delaware Authority and Delaware County. Plaintiffs presented absolutely no evidence to support this allegation at the preliminary injunction hearing. Moreover, I heard the testimony of Mr. Boling, President of the Chester Authority who testified on cross-examination that the decision to close the Lanchester landfill to out-of-county trash was made by the Authority alone without consultation with the county. Plaintiffs were unable to refute this testimony. They argue, however, that they should be given an opportunity to conduct extensive discovery to determine whether indeed there was some concerted activity. Discovery, however, is not to be a fishing expedition. Furthermore, when plaintiffs' counsel filed this complaint, they were under an obligation to certify that a claim is well grounded in fact. Fed.R.Civ.P. 11. Plaintiffs failed to provide me with even a shred of evidence to support a claim that there was any concerted activity between the counties and the respective authorities such that would warrant allowing them time to develop factual support for this theory through discovery. Pure speculation does not warrant a continuance pursuant to Fed.R.Civ.P. 56(f).

■ Similarly, I reject plaintiffs' contention that there is an element of consciously parallel behavior between the pairs of defendants. Plaintiffs are merely acting on suspicions for which they have absolutely no factual basis. Evidently, plaintiffs believe that it is incredible that two solid waste authorities would act to close their respective landfills to out-of-county trash within two months of each other. I find, however, that this behavior is not at all unusual given that these landfills both started taking an increased volume in late 1984 as a stop-gap measure in response to the closure of the Kinsley Landfill in Deptford, New Jersey to Philadelphia trash. Both landfills experienced rapidly increasing volumes of trash which they were not

equipped to handle on a continual basis. The natural response was to find a means to reduce the daily volume deposited while still serving the interests of the respective counties. Plaintiffs have presented no evidence to the contrary.

Furthermore, as defendant Chester County has argued, conscious parallelism without more does not give rise to an antitrust violation. Plaintiffs must establish that (1) the consciously parallel behavior was in contradiction of defendants' own economic interest, and that (2) the defendants had a motive to enter into an agreement. *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 208 (3d Cir.1980). Plaintiffs have failed to establish either of these elements.

Moreover, there has been no restraint of trade shown. In determining whether there is a restraint of trade, one must look to the market impact of the challenged activity; plaintiffs have not clearly identified what market they believe has been adversely affected by defendants' actions in closing the respective landfills to out-of-county trash. Plaintiffs simply speak in terms of the elimination of inter-county competition for the use of the two landfills. Memorandum at 21. All haulers of out-of-county trash, however, are subject to the same restrictions, so there has been no restriction of competition as between these haulers. Moreover, plaintiffs are still free to compete for the hauling of in-county trash. The counties themselves are not in competition with one another. The only other market possibly affected by defendants' actions is the market for the disposal of waste. By closing the two landfills, defendants have withdrawn a competitor from the market; they have not restricted competition among the landfills because the other landfills are free to accept or refuse additional waste and other persons or entities are still free to open new landfills.

Similarly, a mere refusal to deal does not give rise to a violation of the Clayton Act. *Anaya v. Las Cruces Sun News*, 455 F.2d 670, 672 (10th Cir.1972); *Harlem River Consumers Co-op., Inc. v. Associated Grocers of Harlem, Inc.*, 371 F.Supp. 701, *aff'd.* 493 F.2d 1352 (2d Cir. 1974). Section two of the Clayton Act, 15 U.S.C. § 13, expressly recognizes a party's right to choose its own customers on the basis of business necessity. Defendants here have clearly established that the needs of the respective counties and their citizens necessitated the closure of the landfills to out-of-county trash.

Another element of an antitrust violation is that the alleged violation acts with an anticompetitive purpose or the specific intent to acquire a monopoly, to fix prices or to establish market dominance and drive out existing competitors. Usually, the question of a defendant's motivation is a factual question which should not be taken from the jury. *California Steel and Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1004 (9th Cir.1981). In this case, I conclude that not only have plaintiffs failed to establish a probability of success as to the issue of defendants' anticompetitive purpose for purposes of a preliminary injunction but also that plaintiffs have provided absolutely no evidence that the purpose of the Chester and Delaware Authorities in closing the Lanchester and Colebrookdale landfills, respectively, was anything other than what they said it was, to fulfill its obligation under state laws to provide for the waste generated within Chester County. To escape summary judgment, plaintiffs must present sufficient evidence to establish that there is a genuine issue of material fact. While I am aware that it is difficult if not impossible for plaintiffs in cases of this kind to point to a "smoking gun," plaintiffs must still convince me "that it is reasonable to infer the existence of the gun from the facts shown." *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1117 (5th Cir. 1979). Plaintiffs have not so convinced me, and I am convinced that additional discovery would not assist plaintiffs in proving their theory here. I heard extensive testimony from Mr. Boling, Mr. Schaeffer, and Mr. Petaccio that the two landfills were closed to out-of-county trash to pre-

serve the life expectancy of the landfills for the counties and to protect the surrounding communities from the environmental hazards posed by the excess tonnage being deposited every day by plaintiffs and other commercial trash haulers.

Finally, plaintiffs' claims for treble damages, interest, costs, and attorneys' fees are barred by the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34–36 (1984). Section 35(a) of the Act provides that "[n]o damages, interest on damages, costs or attorney's fees may be recovered under section 15, 15a, or 15c of this title from any local government, or official or employee thereof acting in an official capacity." Local government is defined to include any county or other special function government unit established by state law. § 34. Therefore, this Act clearly precludes relief against any of the defendants in the form of monetary damages.

*Irreparable Harm*

Plaintiffs contend that they will sustain irreparable harm if defendants are permitted to close the Lanchester and Delaware Landfills to out-of-county trash. Defendants on the other hand contend that there are other landfills available which are ready and willing to accept trash from new haulers or additional trash from present dumpers and that therefore, plaintiffs will not be irreparably harmed.

The evidence presented at the hearing on July 5th was conflicting as to the actual availability of other landfills. Defendants presented testimony of Mr. Schaeffer and Mr. Pettacio to the effect that there are at least six other locations at which plaintiffs could dump the trash they collect: Keystone; GROWS; Knickerbocker; Western Berks; Berks, and the Harrisburg incinerator. Plaintiffs on the other hand in their proffered testimony, stated that no other existing landfills would permit them to come in as new customers and those at which they have existing accounts would not permit increased dumping. Plaintiffs further stated that they do not presently have the equipment to haul the trash long-distance, *i.e.,* to Scranton or Baltimore.

As I noted at the July 5th hearing, no one can doubt the seriousness of the predicament plaintiffs, defendants, and the City of Philadelphia face and I am certainly sensitive to plaintiffs' position. Nevertheless, I do not believe that the relief plaintiffs seek here is appropriate. As I have stated, plaintiffs' due process and antitrust claims fail and the likelihood of success on the equal protection claim is minimal. Moreover, I am not convinced that plaintiffs will be irreparably harmed if I do not issue a preliminary injunction. Plaintiffs' major concern seems to be the increased costs that they will incur if they are forced to haul their trash a greater distance. Monetary damages do not establish irreparable injury for purposes of a preliminary injunction. Moreover, I note that under the Solid Waste Management Act, 35 P.S. § 6018.202 the City of Philadelphia is under an obligation to provide for the disposition of trash generated within its boundaries.

For all these reasons, I conclude that plaintiffs are not entitled to injunctive relief and that judgment should be entered in favor of defendants and against plaintiffs as to plaintiffs' due process and antitrust claims.

*Conclusions of Law*

1. Plaintiffs have not demonstrated a likelihood of success on the merits of its equal protection claim.

2. Defendants are entitled to judgment as a matter of law as to plaintiffs' due process and antitrust claims.

3. Plaintiffs have not shown that they will suffer irreparable harm *pendente lite* if I do grant a preliminary injunction.

4. Plaintiffs are not entitled to a preliminary injunction.