SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Paul A. BILZERIAN, et al., Defendants.

Civ. A. No. 89–1854 SSH.

United States District Court,
District of Columbia.

Jan. 28, 1993.

Barry Goldsmith, Catherin Mary Shea, Washington, DC, for SEC.

No appearance for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court is plaintiff's motion for judgment of disgorgement as to defendant Paul A. Bilzerian. Upon consideration of the motion, the opposition, and replies thereto,

the Court grants judgment for plaintiff in the amount of $33,140,787.07 plus interest.

*Background*

The Securities and Exchange Commission ("the SEC") seeks disgorgement of profits obtained by defendant Bilzerian through transactions in the securities of Cluett, Peabody & Company ("Cluett") and Hammermill Paper Company ("Hammermill"). On September 27, 1989, defendant was convicted in the United States District Court for the Southern District of New York on all counts of a nine-count indictment alleging violations of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) (1988), the federal false statements statute, 18 U.S.C. § 1001 (1988), and the criminal conspiracy statute, 18 U.S.C. § 371 (1988), in connection with activities in the securities of Cluett, Hammermill, H.H. Robertson Company, Inc., and Armco, Inc.[1] Defendant was fined $1,500,000, sentenced to a four-year prison term, placed on two years' probation, and ordered to perform 250 hours of community service.

On August 5, 1991, prior to the commencement of this action, defendant filed a voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida. Subsequently, defendant sought to enjoin the SEC from pursuing this disgorgement action on the grounds of the automatic stay provision of 11 U.S.C. § 362(a). The bankruptcy court rejected defendant's argument, finding that the disgorgement action was excepted from the automatic stay as an exercise of the government's police or regulatory powers. *Bilzerian v. SEC*, 146 B.R. 871, 873 (Bankr.M.D.Fla.1992).

In this action, the Court entered partial summary judgment against defendant, pursuant to Fed.R.Civ.P. 54(b), finding that defendant's conviction was based on the same facts alleged here, and thus collaterally estopped defendant from relitigating the facts underlying his conviction. *See* Order of Partial Summary Judgment and Final Judgment of Permanent Injunction Against Defendant Paul A. Bilzerian (D.D.C. filed April 8, 1991)

1. The SEC makes no claim with respect to H.H. Robertson, Company, Inc., or Armco, Inc.

("April 8th Order"). This Court further found that defendant had violated Exchange Act §§ 10(b), 13(d), 14(d), 14(e), 17(a)(1), 7(c) and 7(f), 15 U.S.C. §§ 78j(b), 78m(d), 78n(d), 78n(e), 78q(a)(1), 78g(c) and 78g(f) and Rules 10b–5, 13d–1, 13d–2, 14d–3, 14d–6, 17a–3, Regulation X and Regulation T, 17 C.F.R. §§ 240.10–5, 240.13d–1, 240.13d–2, 240.14d–6, 240.17a–3, 220.1 *et seq.*, and 224.1 *et seq.*, and permanently enjoined defendant from any such future violations.

*The Cluett Trades*

From April 12, 1985, to May 28, 1985, defendant raised $8,750,000 from individual investors for the purpose of purchasing Cluett securities. A series of trusts was established into which investors deposited their funds. The funds were guaranteed against loss and the proceeds were to be shared among defendant and the other investors. A total of 581,000 shares of Cluett common stock was purchased with these funds.

The first purchases of Cluett took place on April 23 and 24, 1985. Defendant purchased a total of 131,000 shares through Morgan Stanley & Co. ("Morgan Stanley") at an average price of $30.61 per share.

Approximately one month later, on May 21, 1985, defendant entered into an agreement with Jefferies & Company ("Jefferies") pursuant to which Jefferies agreed to acquire 302,000 shares of Cluett in its own account and later sell them to defendant at cost plus interest. On May 28, 1985, defendant consummated the agreement, taking delivery of the shares with a payment of $29.9791 per share.[2] In separate transactions also on May 28, 1985, defendant purchased an additional 98,000 shares of Cluett through Jefferies at a price of $30.06 per share and 50,000 shares through Morgan Stanley at a price of $30.33 per share.

Thus, by May 21, 1985, defendant effectively had acquired control of over five percent of the outstanding shares of Cluett. As such, he was required to file a Schedule 13D on or before May 31, 1985. Defendant, however, failed to make any filing until June 4, 1985. When made, the filing reported the purchase of 581,000 shares of common stock and 2,100 call options at a total cost of $17,821,016.[3] The filing, however, only disclosed the source of $8,800,000 (extended on margin by Morgan Stanley) of the total purchase funds.[4] It did not report the source of the additional $9,021,016.

On July 12, 1985, a Schedule 13D amendment was filed in which defendant reported the remaining balance as being derived from "personal funds." In fact, the majority of the balance—$8,750,000 out of $9,021,016—was not personal but rather was attributable to the trust investors. Thus defendant effectively concealed the existence of the multiple investors and made it appear that he was the sole investor. In addition, neither filing disclosed the existence or nature of the May 21, 1985, Jefferies purchase arrangement.

The last relevant Cluett purchase took place on July 16, 1985, when defendant, with non-trust funds, exercised 2,100 call options acquired on April 12, 1985. This allowed defendant to purchase 210,000 shares of Cluett at a strike price of $35 per share. The total cost, option price plus strike price, was $36.0631 per share. Thus by July 16, 1985, defendant had accumulated 791,000 shares of Cluett.

On October 15, 1985, defendant, having acquired control of 1,138,567 shares, or approximately 14 percent, of Cluett stock, made a tender offer to purchase all of the remaining shares of the company for a price of $40 per share.[5] Defendant was outbid. On November 4, 1985, he sold his position to a third party, West Point Pepperell, for $40 per

---

2. This arrangement is commonly referred to as securities "parking," whereby an investor has the stock acquired in the name of a third party to avoid drawing attention to his accumulation of large amounts of stock.

3. A stock call option gives an investor the right to purchase 100 shares of stock at a specified price (the "strike price") until a specified future date.

4. Funds extended on margin are loans or credit extensions made by the securities firm to the investor.

5. The SEC seeks disgorgement only of profits from 791,000 of these shares.

share, realizing profits in excess of $7,000,-000. In December of 1985, defendant repaid investors the full amounts of their loans plus a sum total of one-half the profits earned on the Cluett trades.

The SEC claims that defendant's profits from these transactions as to 791,000 shares of Cluett stock were based upon illegal activity and requests disgorgement in the amount of $6,540,770.

*The Hammermill Trades*

The Hammermill scheme was substantially similar to the one used in Cluett. From February 25, 1985, to July 11, 1986, defendant raised $13,317,800 from individual investors ("Hammermill investors") for the purpose of purchasing Hammermill securities. The funds were funneled to defendant through a series of trusts.[6] The investors were guaranteed against loss and the proceeds were to be shared among defendant and the investors.

Defendant used the funds raised to purchase Hammermill securities through Bilzerian & Mack Associates ("B & M"), a partnership, and its wholly-owned subsidiary HPC Acquisition Company ("HPC"). There were three parties to the B & M partnership. They were defendant, who acted as the managing general partner of B & M, Bilzerian Investors, L.P. ("Bilzerian Investors"), of which defendant was general partner, and Mack Asset Co., L.P. ("Mack").[7] The capital commitments made were $10,000,000, $27,-500,000, and $37,500,000 respectively. Thus defendant's two interests represented a total of $37,500,000, one-half of B & M's capital. This amount included the $13,317,800 raised from the Hammermill investors.

Defendant, in his capacity as managing general partner of B & M, first purchased Hammermill common stock on June 23, 1986. A total of 775,000 shares was bought through E.F. Hutton ("Hutton") at a price of $40.07 per share.

Then, on June 26, 1986, defendant entered into a parking agreement with Jefferies whereby Jefferies would acquire shares of Hammermill in its own account and later sell them to defendant at cost plus interest. Pursuant to this arrangement, Jefferies acquired 551,000 shares between June 26, 1986, and July 16, 1986. Defendant did not take delivery of the shares until July 21, 1986. The total cost incurred was $42.78 per share.

As a result of this arrangement, defendant became the beneficial owner of in excess of five percent of Hammermill stock on June 27, 1986, and was thus required to file a Schedule 13D by July 7, 1986. No filing was made.

On July 16, 1986, defendant purchased an additional 276,500 shares of Hammermill through Hutton at a cost of $43.50 per share. On July 24, 1992, defendant purchased 1,674,-700 shares for $52.00 per share.

On July 25, 1986, defendant filed a combined Schedule 13D and Schedule 14D–1 tender offer statement. The Schedule 13D filing was 18 days late. It disclosed that B & M and HPC had, at a cost of approximately $153,738,180, acquired 3,281,250 shares, or approximately 20 percent, of Hammermill's stock.[8] Of the total cost, $87,084,400 had not been borne as the final trade had not yet settled. The filing represented that approximately $10,000,000 of the $66,653,780 actually expended on Hammermill stock was from defendant's "personal funds" while, in fact, the funds were attributable to the Hammermill investors. Furthermore, the filing did not disclose the existence or nature of the Jefferies parking arrangement.

The tender offer statement announced a bid of $52.00 per share for the outstanding shares of Hammermill. However, again defendant was outbid and, on September 10, 1986, all the shares were sold to Internation-

---

6. Defendant, the Hammermill investors, and David A. Tallant, an associate of defendant, had agreed that the funds would be deposited in trusts with Tallant and then immediately forwarded to defendant.

7. The SEC makes no allegation of impropriety as to Mack.

8. Neither the SEC's nor defendant's pleadings account for the source of 4,050 of the 3,281,250 shares of Hammermill allegedly held by defendant. The Court makes no findings with respect to these shares.

al Paper Company: 2,811,056 shares were sold for $64.50 per share and 470,194 shares were sold for $64.31 per share. Profits of approximately $57,551,883 were realized from these transactions. Later that month, defendant repaid investors the full amount of their loans plus a sum total of one-half of the profits earned on the shares of Hammermill purchased with investor funds.

The SEC claims that one-half of the profits realized was attributable to defendant's illegal activity and thus requests disgorgement in the amount of $28,775,941.50.

### Discussion

Having held in the April 8th Order that defendant violated federal securities laws and having enjoined defendant from committing any such future securities violations, the Court considers whether disgorgement is an appropriate remedy and, if so, the proper amount of such disgorgement.

### Preliminary Issues

Defendant contends that this action is improper because ordering disgorgement would be punitive rather than remedial and thus would constitute a second punishment in violation of the Double Jeopardy Clause of the Fifth Amendment.[9] This is not the case. The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. amend. V. As interpreted by the Supreme Court, the clause prohibits the imposition of multiple punishments for the same offense. *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). As such, a defendant who has been punished in a criminal prosecution may be subjected to an additional civil sanction to the extent that the second sanction is remedial and not solely for deterrence or retribution. *Id.* at 448–449, 109 S.Ct. at 1902.[10] Thus the central question becomes whether disgorgement here

"can fairly be characterized as remedial." *Id.* at 449, 109 S.Ct. at 1902. Disgorgement has consistently been recognized as remedial rather than punitive. *United States v. Furlett,* 974 F.2d 839 (7th Cir.1992); *see, e.g., Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211 (7th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 *and reh'g denied,* 444 U.S. 888, 100 S.Ct. 189, 62 L.Ed.2d 122 (1979); *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978). Furthermore, disgorgement may not be used punitively. *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C.Cir.1989). The primary purpose of disgorgement is not to punish the wrongdoer but rather to prevent the unjust enrichment of the wrongdoer by depriving him of ill-gotten gains. *Id.; see also Blatt,* 583 F.2d at 1335; *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1104 (2d Cir.1972). The SEC seeks a sanction based solely on profits flowing from defendant's wrongdoing; it seeks no amounts in excess of defendant's ill-gotten gains. Thus this disgorgement action is not barred by the Double Jeopardy Clause. Defendant also states that this action is improper because the district court in New York, having imposed a criminal fine under 18 U.S.C. § 3571(d), has resolved the issue as to the illicit gain he should be required to disgorge.[11] Although § 3571(d) provides a calculation for the potential allowable fine based upon the amount of illicit profit, that fact does not bar a subsequent civil disgorgement for the full amount of the illicit gain. Section 3571(d) deals with a criminal fine. Criminal fines unquestionably are punitive. Thus a fine under § 3571(d) does not address the remedial considerations of disgorgement. Therefore, the Court finds that defendant has merely been assessed a criminal penalty; he has not yet had his illicit profits ordered to be disgorged. Accordingly, the criminal fine is unrelated to the issue here.

---

9. As noted above, defendant was fined $1,500,-000 as part of his criminal sentence.

10. Though disgorgement does serve a deterrent function, deterrence is neither its sole nor primary purpose. *See SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C.Cir.1989).

11. 18 U.S.C. § 3571(d) states:

(d) Alternative fine based on gain or loss. If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss....

*The Appropriate Remedy*

■ Ordering disgorgement for violations of the Exchange Act is appropriate and is within the authority of this Court. *First City Fin.*, 890 F.2d at 1230. "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *Id.* This is accomplished by compelling defendants to "give up the amount by which [they] were unjustly enriched." *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987), *cert. denied*, 486 U.S. 1014, 1015, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). This serves to "prevent defendants from profiting from their illegal conduct." *SEC v. General Refractories Co.*, 400 F.Supp. 1248, 1260 (D.D.C. 1975). Furthermore, if securities laws violators were not required to disgorge illicit profits the "deterrent effect of an SEC enforcement action would be greatly undermined." *Manor Nursing Centers*, 458 F.2d at 1104.

■ Pursuant to his dealings in Cluett and Hammermill securities, defendant violated §§ 10(b) and 13(d) of the Exchange Act. Defendant violated Exchange Act § 10(b) by engaging in fraudulent activity with respect to the purchases and sales of Cluett and Hammermill securities. Defendant violated Exchange Act § 13(d) by failing to file timely disclosures upon accumulation of more than 5 percent of Cluett's and Hammermill's common stock and by making false statements regarding the source of the funds used to purchase such securities. More specifically, in Schedule 13D filings defendant reported funds as being personal when substantial portions were borrowed, defendant failed to report the terms and conditions of these loans, and defendant failed to disclose the nature and existence of the parking arrangements. Defendant must disgorge the profits he obtained as a result of these violations. The sole remaining issue is what portion of these profits is subject to disgorgement.

*Amount of Disgorgement*

■ "[T]he court may exercise its equitable power only over property causally related to the wrongdoing." *First City Fin.*, 890 F.2d at 1231. As such, "the loss complained of must proceed *directly* and proximately

from the violation claimed and not be attributable to some supervening cause." *Wellman v. Dickinson*, 682 F.2d 355, 368 (2d Cir.1982) (emphasis in original) (quoting *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 719 (2d Cir.), *cert. denied, Wood Walker & Co. v. Marbury Management, Inc.*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980)); *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *see also Blatt*, 583 F.2d at 1335 (stating that disgorgement extends to amount by which defendant profited from his wrongdoing). Therefore, a distinction must be drawn between benefits from lawful conduct and benefits from unlawful conduct. *First City Fin.*, 890 F.2d at 1231; *see also Commodities Futures Trading Comm'n v. British American Commodity Options Corp.*, 788 F.2d 92, 93 (2d Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986); *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971) *and reh'g denied*, 404 U.S. 1064, 92 S.Ct. 733, 30 L.Ed.2d 753 (1972); *SEC v. Wills*, 472 F.Supp. 1250, 1276 (D.D.C.1978).

■ In many cases, separating legal from illegal profit is difficult. *First City Fin.*, 890 F.2d at 1232. This is due to the inherent difficulty in predicting stock price responses to alternative variables. *Id.* at 1231. That is, separating price appreciation due to illicit activities from price appreciation which would have otherwise occurred is nearly impossible. "Accordingly, disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Id.* As such, it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains. *SEC v. MacDonald*, 699 F.2d 47, 54 (1st Cir.1983); *SEC v. First City Fin. Corp.*, 688 F.Supp. 705, 727 (D.D.C.1988), *aff'd*, 890 F.2d 1215 (D.C.Cir.1989). The courts have rejected attempts to limit disgorgement to the precise impact of the illegal activity on market price. *First City Fin.*, 890 F.2d at 1232. The SEC need only offer a prima facie reasonable approximation; the burden then shifts to defendant to rebut the presumption. *Id.; MacDonald*, 699 F.2d at 55 (stating that doubts

concerning disgorgement are to be resolved against the defrauding party).[12]

The SEC contends that defendant's wrongdoing constituted a pervasively fraudulent scheme and that all profits reaped were causally related to his wrongdoing. The SEC argues that defendant's violations permitted him to acquire significant positions in Cluett and Hammermill and to deprive the investing public of critical information necessary to evaluate his desire and ability to acquire Cluett and Hammermill. Furthermore, the SEC alleges that defendant's violations allowed him to represent himself as a takeover threat with sufficient wealth and credibility. This permitted defendant, the government states, to "put the compan[ies] in play," drive up the market price, and then to tender his shares to "white knights" at substantial profit.[13]

Therefore, the SEC requests disgorgement of profits from all trades in Cluett and Hammermill. Plaintiff calculates profits by deducting the purchase cost of the shares from the sales proceeds of the shares. The total profits arrived at are $6,540,770 for Cluett and $57,551,883 for Hammermill. The SEC attributes all the profit realized in Cluett and one-half of the profit realized in Hammermill to defendant.[14] This results in a total disgorgement request of $35,316,711.50.

In response to the SEC's contentions defendant makes several relevant points.[15]

With respect to Cluett, defendant contends he is required to disgorge no profit as he purchased no shares of Cluett between May 31, 1985, the Schedule 13D filing deadline, and July 4, 1985, the date on which the filing was made. He concludes, therefore, that his late filing was harmless and caused him to realize no more profit than would otherwise have been realized. This contention fails since defendant is held not only to have made an untimely filing but also, and more importantly, to have made numerous misrepresentations in the filing when made.[16]

With regard to Hammermill, defendant argues that his interest in B & M was only 13.3 percent rather than the 50 percent claimed by the SEC. Defendant contends that his interest in B & M is properly measured by his personal contributions. He states that his interest in B & M should thus only include the $10,000,000 which he directly contributed and not the $27,500,000 contributed by Bilzerian Investors.[17] Defendant, however, fails to disclose or discuss his direct contributions to Bilzerian Investors. He states only that "[t]here is no way to tell from the [Schedule 13D] what my interest was in [Bilzerian Investors]. As it turns out there were several other partners including Bilzerian Ventures, L.P. which also had other partners." (Mem.Opp'n Mot.Pl.J. Disgorgement at 23.) Defendant bears the burden of rebutting the SEC's claim. *See First City Fin.*, 890 F.2d at 1232; *MacDonald*, 699 F.2d

---

**12.** The court in *First City Financial*, realizing the onus this places on defendants, stated that:

> Placing the burden on the defendants of rebutting the SEC's showing of actual profits, we recognize, may result ... in actual profits becoming the typical disgorgement measure. But the line between restitution and penalty is unfortunately blurred, and the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.
> *First City Fin.*, 890 F.2d at 1232.

**13.** A "white knight" is a person or corporation who saves a corporation from an unfriendly takeover by itself taking over the corporation. The white knights here were West Point Pepperell for Cluett and International Paper Company for Hammermill.

**14.** The SEC asserts that defendant had a 50% interest in B & M and HPC (the entities through which the Hammermill purchases were made). The SEC bases its 50% figure on capital commit-

ments made by each of the three parties to B & M. As noted above, defendant's two interests contributed one-half of B & M's total capital.

**15.** Most of defendant's brief addresses issues already settled by his conviction in the Southern District of New York and by the partial summary judgment entered against him in this Court.

**16.** Defendant alternatively argues that he incurred expenses of $6,000,000 in his attempt to purchase Cluett and that these expenses should be offset against his $6,540,770 in profits. Even assuming this to be proper, defendant bears the burden of proving that these expenses were in fact incurred. *See First City Fin.*, 890 F.2d at 1232; *MacDonald*, 699 F.2d at 55. Defendant has merely asserted a bald figure and has made no attempt to substantiate it.

**17.** As noted above, defendant is the general partner of Bilzerian Investors.

at 55. No such attempt has been made; thus the SEC's figure must prevail.[18]

The SEC's argument, however, overlooks the fact that a portion of the profit was attributable to legal activity. In both the Cluett and Hammermill transactions, the illegal conduct resulted from untimely filings of the Schedule 13D and misinformation contained in the Schedule 13D. Therefore, the first instances of wrongdoing occurred when defendant failed to meet the Schedule 13D filing deadlines. In Cluett, 581,000 shares of the 791,000 total were purchased on or before May 28, 1985, prior to the Schedule 13D filing deadline of May 31, 1985. In Hammermill, 1,153,100 shares of the 3,277,200 total were purchased prior to the July 7, 1986, Schedule 13D deadline. Thus all of defendant's profits were not attributable to illicit activity.

█ The amount of profit causally related to the wrongdoing is the stock appreciation resulting from defendant's untimely and inaccurate Schedule 13D filing. Thus, ideally, the appropriate amount of disgorgement should be the difference between the sale price of the securities and what their market price would have been but for defendant's untimely and inaccurate filing. *See SEC v. Unioil,* 951 F.2d 1304, 1306 (D.C.Cir.1991) (Edwards, J., concurring). The amounts causally related to stock appreciation not resulting from the illegal filing are properly characterized as licit and not subject to disgorgement. *See First City Fin.,* 890 F.2d at 1231. As it is nearly impossible and speculative to determine the market price but for the illicit conduct, *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 172 (2d Cir.1980), a rea-

sonable approximation of this amount must suffice. *First City Fin.,* 890 F.2d at 1231.

A reasonable approximation of defendant's illicit profit is the amount he gained while in violation of the law. *First City Fin.,* 890 F.2d at 1232; *MacDonald,* 699 F.2d at 54. The Schedule 13D deadlines marked the inception of defendant's wrongdoing. As such, profits from stock appreciation prior to the deadlines are properly treated as legal. Profits from stock appreciation subsequent to the deadline serve as a reasonable approximation of illegal profit. Therefore, the appropriate amount of disgorgement here is the difference between the sale price of the securities and the market price on the day the Schedule 13D was required to be filed.

█ In Cluett, 791,000 shares of stock were sold for $40 per share. On May 31, 1985, the Schedule 13D filing deadline, defendant possessed 581,000 shares of Cluett. The closing market price of Cluett on that day was $33.125 per share.[19] The illicit profit on these shares was $3,994,375. Subsequently, an additional 210,000 shares were purchased at a total cost of $36.0631 per share. The illicit profit on these shares was $826,749. Thus the Court requires defendant to disgorge $4,821,124, the total profits gained from Cluett stock while in violation of the law.

In Hammermill, 2,811,056 shares of stock were sold for $64.50 per share and 470,194 shares of stock were sold for $64.31 per share. On July 7, 1986, the filing deadline date, defendant held 1,153,100 shares of Hammermill. The stock closed at $41.75 per share on that day.[20] The profit on these

18. Defendant also argues that disgorgement is inappropriate in that it bears no relation to the government's costs or losses. This contention is without merit. Disgorgement serves to force a defendant to relinquish the amount by which he was unjustly enriched rather than to compensate the victims of fraud. *SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985); *Blatt,* 583 F.2d at 1335; *SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 102 (2d Cir.1978).

19. This price per share is the Cluett common stock closing price as reported in Standard and Poors Corporation, Daily Stock Price Record of the New York Stock Exchange, Apr.–June 1985 ed. The Court may take judicial notice of closing

stock prices pursuant to Federal Rule of Evidence 201. *See* Fed.R.Evid. 201; *In re Delmarva Sec. Litig.,* 794 F.Supp. 1293, 1300 n. 5 (D.Del. 1992); *FMC Corp. v. Boesky,* 727 F.Supp. 1182, 1196 n. 17 (N.D.Ill.1989); *Jacobsen Mfg. Co. v. Sterling Precision Corp.,* 282 F.Supp. 598, 602 (E.D.Wis.1968); Weinstein & Berger, 1 Weinstein's Evidence, P201[06], at 201–60 (1988).

20. This price per share is the Hammermill common stock closing price as reported in Standard and Poors Corporation, Daily Stock Price Record of the New York Stock Exchange, July–Sept. 1986 ed.

shares was $26,143,688.14.[21] Subsequently, 172,900 shares were purchased for $42.78 per share, 276,500 shares were purchased for $43.50 per share, and 1,674,700 shares were purchased for $52.00 per share. The profit on these shares was $30,495,638. Thus the total profits in Hammermill were $56,639,-326.14. Of this amount, one-half was attributable to defendant. Thus the Court requires defendant to disgorge $28,319,663.07 as a result of his illegal conduct regarding his trades in Hammermill stock.

### Conclusion

Accordingly, for the reasons stated above, the Court finds that defendant profited from violations of the Exchange Act through transactions in the securities of Cluett and Hammermill and is therefore required to disgorge $33,140,787.07 plus interest. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court also expressly finds that, based on the entire record in this case, there is no just reason for delaying entry of final judgment of disgorgement as to defendant Bilzerian. *See* Fed.R.Civ.P. 54(b). Therefore, the Court directs that this judgment of disgorgement be entered as a final separate judgment. *See id.* An appropriate Order accompanies this Opinion.

### ORDER

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that plaintiff's motion for judgment of disgorgement is granted. It hereby further is

ORDERED, that defendant Bilzerian is required to disgorge $33,140,787.07 plus interest. It hereby further is

ORDERED, that, as the Court finds that there is no just reason for delay, this judgment of disgorgement shall be entered as a final separate judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. It hereby further is

ORDERED, that, within 21 days of the date of this Order, plaintiff shall notify the

---

21. The 470,194 shares purchased for $64.31 per share are applied against the shares purchased

Court as to how it intends to proceed as to the remaining defendants.

SO ORDERED.