

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-2000

# Ieradi v. Mylan Lab Inc.

Precedential or Non-Precedential:

Docket 00-3076

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

## Recommended Citation

"Ieradi v. Mylan Lab Inc." (2000). *2000 Decisions.* Paper 176.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/176

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 25, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3076

FRANK P. IERADI, individually and on
behalf of all others similarly situated,

      Appellant

v.

MYLAN LABORATORIES, INC.; MILAN PUSKAR;
FRANK A. DEGEORGE; RODERICK P. JACKSON;
PATRICIA A. SUNSERI

Appeal from the United States District Court
For the Western District of Pennsylvania
D.C. No.: 99-cv-00010
District Judge: Honorable Robert J. Cindrich

Argued: July 20, 2000

Coram: RENDELL, ROSENN, Circuit Judges, and
O'NEILL,* District Judge.

(Filed August 25, 2000)

Andrea Bierstein (Argued)
Kirby, McInerney & Squire
830 Third Avenue 10th Floor
New York, NY 10022

_____

* Honorable Thomas N. O'Neill, Jr., United States Senior District Court
Judge for the Eastern District of Pennsylvania, sitting by designation.

Stephen J. Jurman
114 Portvue Drive
Moon Township, PA 15108

 Counsel for Appellant

James B. Weidner (Argued)
Martin L. Seidel
Clifford, Chance, Rogers & Wells
200 Park Avenue
New York, NY 10166

Gordon W. Schmidt
Doepken, Keevican & Weiss
600 Grant Street
USX Tower, 58th Floor
Pittsburgh, PA 15219

 Counsel for Appellees

OPINION OF THE COURT

ROSENN, Circuit Judge.

In this time of rapidly escalating prices of branded and generic drugs, the primary question on this appeal pertains to the adverse impact of such prices not on the consumer public, but rather on potential stockholders of a leading drug manufacturer. Plaintiff Frank P. Ieradi purchased common stock in defendant Mylan Laboratories, Inc. (Mylan), in the face of a price investigation being conducted by the Federal Trade Commission (FTC). The investigation, which focused on Mylan's recent increases in the prices of fourteen of its drugs, ultimately resulted in the FTC filing a complaint in federal district court alleging that Mylan had engaged in practices in restraint of trade in violation of the Sherman Act. The plaintiff alleges that initiation of the action by the FTC, in turn, caused Mylan's stock price to drop over three points.

Following this drop in stock price, Ieradi filed a complaint in the United States District Court for the Western District of Pennsylvania claiming that Mylan violated section 10(b) of the Securities and Exchange Act of 1934 (the 1934 Act)

2

and Securities and Exchange Commission Rule 10b-5 by concealing, in both its press releases and filings with the Securities and Exchange Commission (SEC), the existence of two supply contracts which gave Mylan exclusive access to raw materials necessary to produce two of its generic anti-anxiety medications. These exclusive contracts enabled Mylan to obtain higher prices for drugs and presumably greater profits for its stockholders. The complaint also charges that the individual officers and directors of Mylan are liable for its misconduct because they are control persons within the meaning of section 20 of the 1934 Act. The District Court dismissed Ieradi's complaint, holding that disclosure of the exclusive supply contracts would not have significantly altered the total mix of information available to the reasonable investor, and that therefore the failure to disclose specifically those contracts was not material. Ieradi timely appealed and we affirm. 1

I.

Mylan manufactures and markets generic pharmaceuticals, including two anti-anxiety medications named lorazepam and chlorazepate. The raw materials essential to the manufacture of these two drugs are produced solely by Profarmaco S.r.l. ("Profarmaco"), an Italian company, and distributed in the United States solely by Gyma Laboratories of America ("Gyma"). In November of 1997, Mylan entered into agreements with Profarmaco and Gyma that gave it exclusive access to these raw materials in the United States for a period of ten years.

Shortly after entering the agreements, Mylan raised its prices significantly on fourteen generic drugs, including lorazepam and chlorazepate. On January 12, 1998, Mylan increased the price of chlorazepate tablets by amounts ranging from 1900% to 3200%. On March 3, 1998, Mylan raised its prices on lorazepam tablets. These increases ranged from 1900% to 2600%. Mylan made the increases, although the cost of manufacturing both clorazepam and lorazepate remained steady.

_____

1. The district court had subject matter jurisdiction under 28 U.S.C. S 1331. We have appellate jurisdiction under 28 U.S.C. S 1291.

On February 17, 1998, Mylan filed its Form 10-Q with the SEC for the quarter ending December 31, 1997. In this 10-Q, Mylan reported on the existence of an exclusive supply and distribution agreement it had entered into with a Canadian company, Genpharm, Inc., relating to the sale of another drug in the United States. The report, however, mentioned nothing about the exclusive contracts with Profarmaco and Gyma.

On June 19, 1998, Mylan filed its Form 10-K with the SEC for the fiscal year ending March 31, 1998. In that filing, the company stated:

> While Mylan anticipates continued benefits from price increases in the near future, the continuation of this trend and any resulting benefits depend on several factors, some of which are beyond the Company's control.

The Form 10-K also reported increases in Mylan's revenues and net earnings of 37% and 132%, respectively.

On July 4, 1998, Mylan filed its Form 10-Q with the SEC for the quarter ending June 30, 1998. The 10-Q reported similar increases with respect to revenues and earnings, attributing the significant earnings improvements to overall shipment volumes and selective price increases on fourteen products implemented during the June 1998 quarter. The 10-Q then disclosed the existence of an investigation by the Federal Trade Commission ("FTC").

Specifically, the 10-Q stated:

> As a result of price increases initiated by the Company during the past six months, the Company has received notification from the Federal Trade Commission that it is investigating whether the Company and others have engaged in activities restricting competition in the manufacture or sale of pharmaceutical ingredients or products. The Company is cooperating fully with the review and is providing all the information requested by the Commission. As with all governmental inquiries the process is inherently uncertain.

The 10-Q further reported:

4

While these price increases have favorably impacted earnings in the current quarter, the extent if any in future quarters depends upon several factors, some of which are beyond the Company's control. During the quarter ended June 30, 1998, the Company received notice that the Federal Trade Commission . . . , in light of the price increases, was investigating whether the Company and others had engaged in activities restricting competition in the manufacture or sale of pharmaceutical ingredients or products. The Company is cooperating fully with this investigation and is supplying the documents requested. Management believes that the Company has acted properly and in full compliance with the Federal Trade Commission Act and all other laws and regulations governing trade and competition in the marketplace. . . . The Company believes the ultimate resolution of this matter will not have a material adverse effect on the Company's financial position or results of operations.

In the "Forward Looking Statements" section of the same 10-Q, Mylan stated:

The Company may be unable to realize [its] plans and objectives . . . due to various important factors, including, but not limited to, . . . if the FTC concludes, on the basis of its investigation, that the Company has acted improperly.

On July 6, 1998, the Wall Street Journal reported on Mylan's price increases on the fourteen drugs, including lorazepam and chlorazepate. Around that time, a Mylan spokesperson specifically denied that Mylan had cornered the market on certain raw materials needed to manufacture these two anti-anxiety medications. However, on or about July 20, 1998, Mylan Vice President Patricia Sunseri revealed that the FTC had sent a subpoena to the company the previous month asking about a series of price increases on generic drugs since the prior fall. Sunseri claimed the FTC "just wanted to make sure . . . [the price increases] w[ere] justified." Still, Mylan made no public reference at this time to its contracts with Profarmaco and Gyma.

On October 26, 1998, Ieradi purchased 100 shares of Mylan stock at a price of $33-13/16.

5

On December 5, 1998, the public learned that the FTC notified Mylan that it was preparing to sue the company, alleging that Mylan had raised prices after cornering the market on raw materials used to produce anti-anxiety drugs. Following this announcement, Mylan's stock price dropped from $34-3/8 on Friday, December 4, to $31-5/16 on Monday, December 7. The FTC subsequently initiated an action charging Mylan, Profarmaco, and Gyma with various violations of the antitrust laws. The case has since been settled, subject to judicial approval. The settlement requires that Mylan disgorge $147 million in profits derived from its price increases.[2]

II.

Section 10(b) of the 1934 Act broadly prohibits the use of "manipulative or deceptive devices" in connection with the purchase or sale of a security. SEC Rule 10b-5, promulgated thereunder, prohibits persons from, inter alia, making "any untrue statement of a material fact or omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading . . . ." To state a claim for securities fraud under Section 10(b) and Rule 10b-5,

> a private plaintiff must plead the following elements: (1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage. . . . Also, because section 10(b) claims sound in fraud, the circumstances constituting the fraud must be stated with particularity. . . .

_____

2. We take judicial notice under Federal Rule of Evidence 210(f) of an article in the New York Times of July 13, 2000 entitled "Generic Drug Maker Agrees to Settlement in Price-Fixing Case." See United States v. Poszgai, 999 F.2d 719, 731 (3d Cir. 1993)(appellate court may take judicial notice of a matter not before the District Court); See also Peters
v. Delaware River Port Authority, 16 F.3d 1346, 1356-57 (3d Cir. 1994)(appellate court may take judicial notice of newspaper articles).

6

> [Federal Rule of Civil Procedure] 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage. . . .

In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir. 1996) (citations and internal quotation marks omitted).

The plaintiff alleges that defendants, in disregard of their duty to disseminate accurate and truthful information to public investors of a company whose common stock was listed and actively traded on the New York Stock Exchange, publicly attributed Mylan's increased revenues primarily to continued growth in all product lines when, in fact, the Company's success "was primarily possible because of its contracts with Profarmaco and Gyma for [the raw materials for] lorazepam and chlorazepate." (Para. 35 of Complaint.) The plaintiff further alleges that Mylan downplayed the risk that the FTC investigation would materialize into a federal civil action by specifically denying in its statements to the press that it had "cornered the market" on the raw materials necessary to produce lorazepam and clorazepate and by stating in its SEC filings that the Company believed it acted properly in increasing the prices of its drugs.

According to the plaintiff, these statements artificially inflated the price of Mylan's common stock because they failed adequately to inform investors of the risk that the FTC investigation would materialize into a civil action directed at the Company's primary source of increased revenues. In making this claim, the plaintiff does not contend that Mylan was required to provide the investing public with a summary of the FTC's case against the Company followed by a summary of the Company's defense. Nor does he argue that Mylan was required to admit that it had monopolized the raw materials market in question. Rather, he argues that in commenting on the FTC investigation Mylan had a duty to disclose the existence and substance of its exclusive supply contracts with Profarmco and Gyma so that he and other reasonable investors could intelligently assess the risk that the FTC

7

investigation would result in a civil antitrust action against Mylan.

As noted above, the District Court held that Mylan's failure to disclose specifically the exclusive supply contracts was not material because this information would not have significantly altered the total mix of information available to the reasonable investor. The issue of materiality is a mixed question of law and fact. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976). However, because we must accept all factual allegations contained in Ieradi's complaint as true for purposes of this motion to dismiss, our review of the District Court's decision is plenary. See Port Auth. of N.Y. and N.J. v. Arcadian Corp., 189 F.3d 305, 311 (3d Cir. 1999); Alexander v. Whitman, 114 F.3d 1392, 1397–98 (3d Cir.), cert. denied, 522 U.S. 949 (1997).

"The question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." TSC, 426 U.S. at 445; see also Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988) (applying TSC materiality standard to claim under Section 10(b) and Rule 10b–5). "An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding" how to act. Id. at 449. It contemplates "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." Id.

When "alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," dismissal is warranted. Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 n.11 (3d Cir.), cert. denied, 502 U.S. 934 (1992). However, where there is room for differing opinions on the issue of materiality, the question should be left for jury determination. See Ballan v. Wilfred Am. Educ. Corp., 720 F. Supp. 241, 249 (E.D.N.Y. 1989).

8

Returning to the case at bar, we see no error in the District Court's conclusion that Mylan's failure to disclose the existence and substance of the exclusive supply contracts was immaterial. First, as Ieradi acknowledges, in Mylan's 10-Q for the quarter ending June 30, 1998, the Company did disclose that the FTC was investigating "whether the Company and others had engaged in activities restricting competition in the manufacture or sale of pharmaceutical ingredients or products." Moreover, in the "Forward Looking Statements" section of the 10-Q, Mylan also disclosed that it "may be unable to realize[its] plans and objectives . . . if the FTC concludes, on the basis of its investigation, that the Company has acted improperly." We think this public disclosure was more than sufficient to put potential investors such as Ieradi on notice that Mylan's alleged anticompetitive activity in raising the prices of its drugs, including chorazepate and lorazepam, could subject the company to antitrust action by the FTC.

Moreover, we find support for the District Court's conclusion that disclosure of the two exclusive contracts was immaterial in the action of the stock market that followed the FTC investigation. Although the revenues and earnings of the company substantially increased, as reported in its Form 10-Q for the quarter ending June 30 1998, the closing stock market price for Mylan common stock price fell sharply following the disclosure of the FTC investigation into Mylan's anticompetitive activities. After a closing high of 35 on July 17, 1998, Mylan's stock price declined every successive day thereafter except one, even without any information pertaining to the exclusive supply contracts, until the close of 25 on August 4, 1998. 3 This

_____

3. Under Federal Rule of Evidence 201, we may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned. See SEC v. Bilzerian, 814 F. Supp. 116, 123 n. 10 (D.D.C. 1993); Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence  S 201.12[8] (Joseph McLaughlin, ed., Matthew Bender 2d ed. 1997). The opening and closing stock prices on the New York Stock Exchange for Mylan during the period of July 17 to August 4, 1998 are reported by Quotron Chart Service.

drop of ten points is more than 300 per cent in excess of the 3 1/6 point "plummet" that occurred several months after the plaintiff purchased stock on October 26, 1998.

Second, we disagree with Ieradi to the extent he argues that, with the knowledge of the exclusive supply contracts at issue in this litigation, a reasonable investor would have been able to assess the risk that the FTC investigation would have resulted in the commencement of a civil action. As the district court noted, exclusive supply contracts that allow a company to raise prices, and thereby increase revenue, are usually viewed as advantageous to investors. Moreover, although Ieradi does allege that the contracts at issue here were anticompetitive and in violation of the antitrust laws, we seriously doubt that "the reasonable investor" possesses the depth of antitrust law expertise that would allow him or her to conclude that the contracts were susceptible to successful attack under the antitrust laws. Knowledge that the FTC was engaging in an investigation of Mylan's extraordinary pricing of its drugs because of its anticompetitive activities was much more informative to "the reasonable investor" than information pertaining to Mylan's exclusive contracts for raw materials for two of its drugs.

Armed with information of the FTC investigation into Mylan's anticompetitive activities, we believe that Ieradi was sufficiently informed on October 26, 1998, the date he purchased his Mylan stock, that the Company faced a risk of a civil antitrust action. We are further persuaded that the disclosure of the exclusive supply contracts at issue in this case would have been of little, if any, benefit to the reasonable investor.

III.

Accordingly, we conclude that the District Court committed no error in holding that the non-disclosure of the exclusive contracts relating to lorazepam and chlorazepate was not a material fact. For the reasons set forth above, the order of the District Court will be affirmed. Costs taxed against the appellant.

10

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

11