SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Sam M. ANTAR, Allen Antar, and Benjamin Kuszer, Defendants,

and

Rori Antar, Sam A. Antar, Michelle Antar, Adam Kuszer, Sam Kuszer, Simon Kuszer, Rose Antar, and Sam M. Antar, Relief Defendants.

Securities and Exchange Commission, Plaintiff,

v.

Rose Antar, Ellen Antar Kuszer, Jill Antar, R.A.S. Partnership, L.P., and S.T. Partnership, L.P., Relief Defendants.

No. 93–CV–3988 (HAA).

United States District Court, D. New Jersey.

Nov. 17, 2000.

Susan C. Cassell, Office of the United States Attorney, Newark, NJ, for Plaintiff.

Bruce I. Goldstein, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, Peter J. Kurshan, Chase Kurshan Suhr Weidenfeld Herzfeld & Rubin, LLC, Livingston, NJ, Joseph L. Cook, Law Offices of Joseph L. Cook, Roseland, NJ, Solomon E. Antar, Brooklyn, NY, Shari B. Kibel, Tenzer Greenblatt LLP, New York City, for Defendants.

## *OPINION*

ACKERMAN, District Judge.

This matter comes before the court on the motion of plaintiff Securities and Exchange Commission ("SEC") for summary judgment on its claims against relief defendants Rose Antar, R.A.S. Partnership, L.P. and S.T. Partnership, L.P. The relief defendants oppose the motion on the grounds that it is both premature and without merit. For the reasons set forth below, plaintiff's motion for summary judgment is granted.

*Factual and Procedural Background*

The details of the extensive securities fraud perpetrated by defendant Sam M. Antar and others have been described at length in this court's earlier opinions and need not be reiterated here. *See SEC v. Antar*, 97 F.Supp.2d 576 (D.N.J.2000); *SEC v. Antar*, 15 F.Supp.2d 477 (D.N.J. 1998). In September and October of 1997, this court conducted a bench trial to determine the liability of several defendants and

relief defendants for securities fraud in connection with the sale of stock in Crazy Eddie, Inc. ("Crazy Eddie"). In an opinion issued on July 15, 1998, this court found in favor of the SEC on all of its claims and held that Sam M. Antar, Allen Antar and Benjamin Kuszer engaged in insider trading in connection with their sales of stock in Crazy Eddie, thus violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b–5. The court further ruled in favor of the SEC on all of its claims against relief defendants Rori Antar, Sam A. Antar, Michelle Antar, Adam Kuszer, Sam Kuszer and Simon Kuszer. These relief defendants were found to have been unjustly enriched by funds obtained through the defendants' elaborate cash-skimming and insider trading scheme. The court held that the relief defendants had no legitimate claim to the fraudulent stock sale proceeds generated on their behalf. Thus, this court held that Sam M. Antar, Allen Antar, Benjamin Kuszer and the six relief defendants would be required to disgorge all illegal profits.

On December 1 and 4, 1998, the court held an evidentiary hearing on the amounts of disgorgement to be paid by the defendants and relief defendants. Before the court rendered a decision on that issue, a consent judgment was entered against relief defendants Adam Kuszer, Sam Kuszer and Simon Kuszer in favor of the SEC. *See* Order of March 20, 2000. Thereafter, on April 27, 2000, this court issued an opinion setting forth the amounts of illegal profits and pre-judgment interest to be disgorged by the defendants and the remaining three relief defendants. *See SEC v. Antar*, 97 F.Supp.2d at 587–88. Final judgment was entered against defendants Sam M. Antar, Allen Antar and Benjamin Kuszer and relief defendants Rori Antar, Sam A. Antar and Michelle Antar on May 15, 2000. Sam M. Antar was ordered to disgorge $15.087 million plus $42,423,642 in pre-judgment interest. Allen Antar was ordered to disgorge $3.438 million plus $8,473,045 in pre-judgment interest. Benjamin Kuszer was ordered to disgorge $850,000 plus $2,456,240 in pre-judgment interest. Relief defendants Rori, Sam A. and Michelle Antar were each ordered to disgorge $425,000 plus $303,805 in pre-judgment interest.

Meanwhile, on October 6, 1999, the court granted the SEC leave to file an amended and supplemental complaint asserting new claims against additional relief defendants. On October 7, 1999, the SEC filed the Amended and Supplemental Complaint. The SEC alleged that prior to the 1997 trial in this action, various assets were transferred from the defendants to relief defendants Rose Antar, Ellen Antar Kuszer, Jill Antar, R.A.S. Partnership, L.P. and S.T. Partnership, L.P. The SEC asserted that the transfers were fraudulent under New Jersey's Uniform Fraudulent Transfers Act and that the relief defendants were unjustly enriched by the transfers. The SEC requested that the transfers be voided as fraudulent, that the assets be placed in a constructive trust and that the relief defendants convey title to the assets or disgorge the value of the assets. On October 15, 1999, the SEC filed a motion for summary judgment on the claims set forth in the Amended and Supplemental Complaint. The court heard oral argument on the motion on June 16, 2000.

The SEC's claims against two of the five relief defendants named in the Amended and Supplemental Complaint have since been resolved. Final judgment by consent was entered against relief defendant Ellen Antar Kuszer on February 28, 2000. Relief defendant Jill Antar was never served with the summons and Amended and Supplemental Complaint and the SEC voluntarily dismissed the action against her. This court entered an order dismissing the action against Jill Antar on September 28, 2000. Thus, the SEC's only outstanding claims are against Rose Antar, R.A.S. Partnership, L.P. and S.T. Partnership, L.P. (hereinafter "relief defendants").

The SEC's claims pertain to several transfers of property by defendant Sam M. Antar to relief defendant Rose Antar in 1991 and 1997. The SEC alleges that after several of the transfers, Rose Antar, in turn, transferred the assets to herself and her daughter as trustees and to the entities R.A.S. Partnership, L.P. and S.T. Partnership, L.P. The alleged 1997 transfers are as follows:

On April 8, 1997, Sam M. Antar transferred his 25 percent interest in S & E Realty Partnership to Rose Antar. (10/27/98 Sam M. Antar Interrogatory Responses, attached as Exhibit 1 to the Declaration of Richard E. Simpson ("Simpson Dec.") at 4). This partnership is the nominal owner of a piece of real estate in Nogales, Arizona. (Id.) Sam M. has estimated his partnership interest to be worth $175,000. (Id.) His interest is now purportedly owned by the S.T. Partnership, L.P. (11/11/98 Sam M. Antar Dep., Simpson Dec. Exh. 2 at 90). The purported owner of S.T. Partnership is Rose Antar.

On April 9, 1997, Sam M. Antar conveyed to Rose Antar the former family residence at 2146 East Third Street in Brooklyn, New York. (4/9/97 Deed, Simpson Dec. Exh. 3). The market value of the property for tax purposes is $270,-000. (Simpson Dec. Exh. 1 at 4). Sam M. claims that he transferred the property to Rose "[b]ecause my grandchildren live there now, that is why. I wanted to make sure they live there forever." (Simpson Dec. Exh. 2 at 93).

On April 30, 1997, Sam M. Antar transferred his 50 percent interest in an entity called "S & E Realty, Inc." to Rose Antar. (Simpson Dec. Exh. 1 at 4). This corporate entity is the nominal owner of real property located at 68 Roosevelt Avenue in Deal, New Jersey. (8/25/98 Mortgage, Simpson Dec. Exh. 4). Sam M. has estimated that his 50 percent interest in S & E Realty, Inc. is worth $750,000 (11/11/98 Letter from Adam S. Ravin to Richard E. Simpson, Simpson Dec. Exh. 5). On August 25, 1998 Rose Antar, purportedly on behalf of S & E Realty, Inc., encumbered 68 Roosevelt Avenue by granting a $500,000 mortgage to Saiber, Schlesinger, Satz & Goldstein.[1] (Simpson Dec. Exh. 4).

On May 15, 1997, Sam M. Antar transferred to Rose Antar his interest in his residence at 717 Ocean Avenue, Unit No. 710, and Cabana No. 46, West End, New Jersey. (5/15/97 Deed, Simpson Dec. Exh. 6). On the same day, Rose transferred the entire property to herself and Ellen Antar Kuszer, as trustees of the "Rose Antar Qualified Personal Residence Trust # 1 dated May 15, 1997." (5/15/97 Deed, Simpson Dec. Exh. 7). Sam M. has estimated his one-half interest to be worth $225,000. (Simpson Dec. Exh. 1 at 3). In the two years since he transferred his interest to Rose, Sam M. has continued living in the residence.

On May 15, 1997, Sam M. Antar transferred to Rose Antar the commercial property located at 2155 route 22 West in Union, New Jersey (5/15/97 Deed, Simpson Dec. Exh. 8). He has estimated that the property is worth $950,000. (Simpson Dec. Exh. 1 at 4). On the same day that Sam M. recorded his transfer of the property in the Union County, New Jersey clerk's office, Rose conveyed the property to the "R.A.S. Partnership, L.P." (8/8/97 Deed, Simpson Dec. Exh. 9). The mailing address of this partnership is Sam M. and Rose Antar's residence.

On May 15, 1997, Sam M. Antar transferred to Rose Antar his interest in a condominium at 19667 Turnberry Isle South, Units Nos. 18–D and CA–11, in Dade County, Florida. (5/15/97 Deed,

---

1. The mortgage recited that it "is being given to secure amounts owed by the Mortgagor [S & E Realty, Inc.] to the Mortgagee for legal services rendered to the Mortgagee [sic] as more particularly described in the letter dated August 18, 1998." (Simpson Dec. Exh. 4). The SEC alleges that the purpose of the mortgage is to finance Sam M.'s ongoing personal litigation expenses.

**436**

Simpson Dec. Exh. 10). On the same day, Rose transferred the entire property to herself and Ellen Antar Kuszer, as trustees of the "Rose Antar Qualified Personal Residence Trust # 2 dated May 15, 1997." (5/15/97 Deed, Simpson Dec. Exh. 11). Sam M. has estimated his one-half interest to be worth $180,000. (Simpson Dec. Exh. 1 at 4). He continues to use the transferred property as a vacation home.

The SEC alleges earlier transfers as well. The SEC asserts that in 1991 Sam M. Antar transferred over $1.7 million of securities to Rose Antar. Specifically, on March 15 and 18, Sam M. transferred securities worth $464,879 from his brokerage account at Shearson Lehman Brothers to a brokerage account in Rose's name. (Sam M. Antar trading records, Simpson Dec. Exh. 12, at 7–10). On October 16 and 17, Sam M. transferred an additional $912,728 worth of securities from his brokerage account at Oppenheimer & Company to a brokerage account in Rose's name. (Id. at 1–4). Also on October 17, Sam M. transferred $333,275 worth of securities from his brokerage account at Shearson Lehman Brothers to a brokerage account in Rose's name. (Id. at 15–18).

The SEC notes that the October 1991 transfers began the day after Sam M. appeared at a deposition in the case *In re Crazy Eddie, Inc. Securities Litigation,* Civ. No. 87–0033 (E.D.N.Y.). During the deposition, Sam M. invoked his Fifth Amendment privilege against self-incrimination in response to questions concerning his knowledge and participation in cash-skimming and insider trading activities at Crazy Eddie, Inc.

Additionally, in November of 1991, the SEC alleges that Sam M. gave Rose a mortgage he held on property located at 51 Columbia Place, Brooklyn, New York. (8/19/98 Declaration of Sam M. Antar, Simpson Dec. Exh. 13, ¶ 9). On February 24, 1997, the mortgagees transferred the property to Rose. (2/24/97 Deed, Simpson Dec. Exh. 15). The market value of the property for tax purposes is $460,000.

The SEC asserts that each and all of these transfers violated New Jersey's Uniform Fraudulent Transfers Act. The SEC also contends that the relief defendants were unjustly enriched by the transfers. Accordingly, the SEC requests that the transfers be voided as fraudulent, that the assets be placed in a constructive trust and that the relief defendants convey title to the assets or disgorge the value of the assets. In the present motion, the SEC seeks entry of summary judgment on its claims against the relief defendants. The relief defendants oppose the motion on several grounds.

*Discussion*

■ At the outset, the relief defendants contend that this court does not have subject matter jurisdiction over the SEC's claims because there is no demonstrable nexus between the property transferred and the illegal actions of Sam M. Antar. The relief defendants argue that, in the absence of evidence showing that the assets transferred constitute illegal profits from Sam M.'s securities fraud, this court lacks subject matter jurisdiction. The SEC responds that there are two bases for jurisdiction over its claims. First, the SEC asserts that the Securities Acts of 1933 and 1934 provide jurisdiction over a wide range of actions designed to enforce the securities laws. The SEC does not contest the relief defendants' assertion that the assets transferred are not necessarily fruits of Sam M.'s fraud; rather, the SEC asserts that there is no "traceability" requirement for jurisdiction. Second, the SEC argues that its claims fall within the ancillary enforcement jurisdiction of this court. The SEC submits that state statutory mechanisms such as New Jersey's Uniform Fraudulent Transfers Act, as well as equitable remedies, may always be used to enforce a federal judgment.

The Securities Acts of 1933 and 1934 provide the district courts with jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty"

created by the securities laws. 15 U.S.C. §§ 77v(a), 78aa. The SEC submits that its claims against the relief defendants represent an effort to enforce the judgment entered against Sam M. Antar for violations of the securities laws. *See* 15 U.S.C. §§ 77v(a), 78aa. As such, the SEC asserts that its claims are designed to enforce a liability created by the securities laws and thus fall within the jurisdictional provisions of the Securities Acts. The SEC also points to the decision of the United States Supreme Court in *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940). In that case, the Court held that 15 U.S.C. § 77v(a) empowers federal courts in securities cases "to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case." *Deckert*, 311 U.S. at 288, 61 S.Ct. 229. Here, the SEC argues that it is simply using ordinary procedures available to a litigant to ensure enforcement and satisfaction of a judgment under the securities laws. *See Deckert*, 311 U.S. at 288, 61 S.Ct. 229. Thus, the SEC contends that this court has subject matter jurisdiction over its claims against the relief defendants.

The relief defendants respond that the seemingly broad grant of jurisdiction set forth in the securities laws does not reach as far as the SEC suggests it does. The relief defendants argue that this court does not have jurisdiction over a "garden variety" fraudulent transfer action, or an action in equity, in the absence of proof that the assets transferred were obtained as a result of illegal activity. Rather, the relief defendants contend that this court only has jurisdiction over the SEC's claims to the extent that such claims involve the "fruits" of Sam M.'s securities fraud. The relief defendants submit that because they are not culpable parties under the securities laws and they did not receive the fruits of Sam M.'s fraud, this court lacks jurisdiction. In support of their argument, the relief defendants rely on several cases. However, each and all of the cases cited are either distinguishable from the present case or address a different jurisdictional question than that presented in this case.

First, the relief defendants cite the court's decision in *SEC v. Deborah Rosen Antar*, 831 F.Supp. 380 (D.N.J.1993) (Politan, J.). In that case, the court determined that it had jurisdiction, pursuant to the securities laws, over claims against non-violators who possessed illegal profits generated by securities fraud. *See Deborah Rosen Antar*, 831 F.Supp. at 401. The court concluded that it had jurisdiction over the assets held by the nominal defendants; the assets were traceable to Eddie Antar's securities fraud and the nominal defendants had no legitimate claim to the assets. *See id.* at 399, 402–03. The court, however, did not hold that "traceability" is a necessary requirement for jurisdiction. Indeed, the court held that "the touchstone for jurisdiction is whether the non-party's claim to the property is legitimate." *Id.* at 399. Moreover, in its opinion, the court cited *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 (2d Cir.1974) and *SEC v. Glauberman*, 1992 WL 175270 at *1–2 (S.D.N.Y. July 16, 1992), both of which held that a court may exercise jurisdiction over claims against non-violators even when the assets held are *not* necessarily fruits of the securities fraud. *See Deborah Rosen Antar*, 831 F.Supp. at 399–401.

The relief defendants also rely on *SEC v. Bilzerian*, 814 F.Supp. 116 (D.D.C.1993), in support of their argument that this court lacks jurisdiction over the SEC's claims. The *Bilzerian* case involved a claim for disgorgement against a violator of the securities laws. In that case, it was held that "[t]he court may exercise its equitable power only over property causally related to the wrongdoing ... [a]s such, the loss complained of must proceed directly and proximately from the violation claimed and not be attributable to some supervening cause." 814 F.Supp. at 121 (internal citations omitted). As such, the court held that, in determining the appro-

priate amount of disgorgement, it is important to distinguish between "benefits from lawful conduct and benefits from unlawful conduct." *See id.* Indeed, the amount of disgorgement ordered must always represent a reasonable approximation of the illegal profits gained and must not extend to legal profits. *See id.* The present case is in an entirely different posture. Here, a judgment and an order of disgorgement have already been entered against the parties who violated the securities laws. The amount of disgorgement set forth in the judgment reflects the amount of illegal profits gained by the violators. The SEC is now attempting to enforce the judgment entered and prevent the defendant, Sam M. Antar, from dissipating his assets in frustration of that judgment. As such, even if the *Bilzerian* decision was binding on this court, the principles enunciated in that case are not applicable at this stage in these proceedings.

The relief defendants also cite *SEC v. Black*, 163 F.3d 188, 196 (3d Cir.1998), in which the court held that the district court may only grant a freeze of assets if the assets are property, or deemed property, of a defendant or culpable third party. Thus, the relief defendants assert that the court's jurisdiction, under the securities laws, extends only to assets that are property, or deemed property, of a culpable party. Because the relief defendants have not been found guilty of violating the securities laws, they argue that this court does not have jurisdiction over their assets. However, it is Sam M.'s property that the SEC seeks to recover in order to satisfy its judgment. As the SEC points out, if not for the transfers at issue in this case, the assets would still belong to Sam M. As such, the assets may be "deemed" property of a culpable defendant and the court may exercise jurisdiction.

Lastly, the relief defendants point to *SEC v. Cherif*, 933 F.2d 403 (7th Cir.1991). In that case, the court held that, pursuant to the grant of jurisdiction under the securities laws, a district court may exercise all equitable powers over defendants and violators, but may only obtain equitable relief from a non-violator "if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them." *Cherif*, 933 F.2d at 413–414 n. 11. Thus, the court in *Cherif* recognized the importance of the distinction between violators and non-violators and illegal profits and legal profits. *See id.* at 414–16. The relief defendants in this case assert that the court may not exercise jurisdiction over the SEC's claims because the relief defendants have not themselves violated the securities laws and the assets transferred are not illegal profits of Sam M.'s securities fraud.

Importantly, however, even if the relief defendants are correct in asserting that the SEC's claims fall outside the grant of jurisdiction under the securities laws, there is still another basis for jurisdiction over the SEC's claims. The court in *Cherif* hinted at this alternative basis for jurisdiction when it questioned why the SEC did not seek to attach the relevant funds under Federal Rule of Civil Procedure ("Rule") 64. *See id.* at 414 n. 12. Rule 64 makes available those remedies used to secure satisfaction of a judgment "under the circumstances and in the manner provided by the law of the state in which the district court is held." The *Cherif* court noted that, under Illinois state law, the SEC could have sought a constructive trust in favor of the injured investors. *See id.* The court made no ruling as to the viability of that option, but suggested that the SEC may have avoided the problem of jurisdiction under the securities laws by employing Rule 64. *See id.*

In accordance with this suggestion by the court in *Cherif*, the SEC argues that the source of this court's jurisdiction is not necessarily federal securities law, but rather, traditional principles of ancillary enforcement jurisdiction. As such, all of the cases cited by the relief defendants are inapplicable and the SEC asserts that its action against the relief defendants is an

appropriate enforcement action, as authorized by Rules 64 and 69. As noted above, Rule 64 provides for the use of state law remedies to secure satisfaction of a judgment before a judgment is entered. Rule 69 provides that "[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought ..." In other words, under Rule 69, a federal litigant may make use of available state law mechanisms for executing a judgment after the judgment is entered.

Of course, Rules 64 and 69 neither extend nor limit the subject matter jurisdiction of the United States district courts. *See* Rule 82; *see also Owen Equip. and Erection Co. v. Kroger*, 437 U.S. 365, 370, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The SEC makes a "common sense" argument that this court must have jurisdiction over its claims; otherwise, a federal judgment debtor would be able to frustrate enforcement of the judgment by dissipating his assets, either before or after judgment is entered. *See* SEC's Reply Brief in Support of its Motion for Summary Judgment ("Reply Brief") at 4–5. In fact, this court's jurisdiction over such claims is based not only on common sense, but also on centuries of United States Supreme Court precedent.

This court's ancillary enforcement jurisdiction is well-established. The Supreme Court has recognized and approved "the use of ancillary jurisdiction in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments." *Peacock v. Thomas*, 516 U.S. 349, 356, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) (see extensive citations therein). Indeed, the Court in *Peacock* explained that without jurisdiction to enforce judgments, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitu-

tion." *Id.* (quoting *Riggs v. Johnson County*, 73 U.S. 166, 6 Wall. 166, 187, 18 L.Ed. 768 (1867)); *see also Finley v. United States*, 490 U.S. 545, 551, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (holding that a federal court may exercise jurisdiction over non-federal claims "when necessary to give effect to the court's judgment"). Accordingly, the Court has consistently approved the exercise of ancillary jurisdiction over a broad range of enforcement proceedings involving third parties, including actions to set aside fraudulent conveyances by judgment debtors. *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 694–95, 70 S.Ct. 861, 94 L.Ed. 1206 (1950) (holding that a federal court's power "to protect its jurisdiction from being thwarted by a fraudulent transfer ... applies equally whether it is concerned with executing its judgment or authorizing an attachment to secure an independent maritime claim"); *Dewey v. West Fairmont Gas Coal Co.*, 123 U.S. 329, 332–333, 8 S.Ct. 148, 31 L.Ed. 179 (1887).

The Court most recently addressed the exercise of ancillary enforcement jurisdiction in the *Peacock v. Thomas* case. 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996). In its decision, the Court reaffirmed the existence of ancillary enforcement jurisdiction, but noted the limited reach of such jurisdiction. *See Peacock*, 516 U.S. at 356–59, 116 S.Ct. 862. Ancillary jurisdiction may be exercised over third parties only to the extent necessary to enforce a federal judgment. *See id.* at 357, 116 S.Ct. 862 (holding that "[o]ur recognition of these supplementary proceedings has not ... extended beyond attempts to execute, or to guarantee eventual executability of, a federal judgment."). In the *Peacock* case, the plaintiff had previously obtained a judgment against a corporation. *See id.* at 351, 116 S.Ct. 862. When the corporation failed to satisfy the judgment, the plaintiff brought a supplementary proceeding to pierce the corporate veil and recover the judgment from an officer of the corpora-

tion. *See id.* at 352, 116 S.Ct. 862. The Court held that "[w]e have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id.* at 357, 116 S.Ct. 862. In other words, federal district courts do not have ancillary jurisdiction over claims where the judgment creditor is attempting to impose personal liability on a new defendant for the original judgment. *See Thomas, Head and Greisen Employees Trust v. Buster,* 95 F.3d 1449, 1454 (9th Cir.1996); *Merrell v. Miller,* 1998 WL 329264 at *2 (E.D.Va. June 8, 1998). Accordingly, a court's ability to exercise ancillary jurisdiction over a judgment creditor's claim turns on whether the claim seeks "to collect a judgment" or "to establish liability" on the part of the third party. *See Buster,* 95 F.3d at 1454 n. 7 (citing *Peacock,* 516 U.S. at 357–59, 116 S.Ct. 862).

In the present case, the SEC does not seek to establish the personal liability of the relief defendants for the judgment entered against Sam M. and his co-defendants. Nor does the SEC attempt to satisfy its judgment against Sam M. by reaching the relief defendants' own assets. Rather, the SEC's claim is exactly the sort of claim approved in *Peacock*—it seeks to reach assets belonging to the judgment debtor but found in the hands of the relief defendants. The SEC seeks only to disgorge from the relief defendants, as alleged fraudulent transferees, the property Sam M. wrongfully transferred to them. *Peacock* reaffirms the SEC's right to pursue these allegations in a Rule 69 proceeding under the court's ancillary enforcement jurisdiction.

For all of these reasons, this court has ancillary enforcement jurisdiction over the SEC's claims against the relief defendants in this case.

Second, the relief defendants contend that the SEC's motion for entry of summary judgment in this matter is prema-

ture. The relief defendants assert that further discovery is needed in order to adequately respond to the SEC's motion. Rule 56(f) authorizes the court to order a continuance if the party opposing the motion for summary judgment sets forth by affidavit the specific reasons why it cannot present facts in opposition to the motion. *See Brown v. Our Lady of Lourdes Med. Ctr.,* 767 F.Supp. 618, 627 (D.N.J.1991). In general, continuances pursuant to Rule 56(f) are liberally granted. *See Mid–South Grizzlies v. Nat'l Football League,* 720 F.2d 772, 779 (3d Cir.1983). This is particularly so when the information sought is solely in the possession of the moving party. *See Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia,* 945 F.2d 1260, 1263 (3d Cir. 1991).

█ However, there are a few instances in which a Rule 56(f) continuance is not appropriate. If the motion is "based on pure speculation and raise[s] merely colorable claims" regarding potential liability, the court acts within its discretion when it denies the motion. *Hancock Indus. v. Schaeffer,* 619 F.Supp. 322, 327 (E.D.Pa. 1985) (citing *Mid–South Grizzlies,* 720 F.2d at 780). Also, if "the non-moving party has the information it seeks in its own possession or can get it from a source other than the movant," the court may deny the motion for a continuance. *See Jeffries v. Deloitte Touche Tohmatsu Int'l,* 893 F.Supp. 455, 458 (E.D.Pa.1995) (citing *Contractors Ass'n,* 945 F.2d at 1263). Finally, "if the non-moving party has had an adequate opportunity to discover the information, then summary judgment may be granted even if the information is solely in the possession of the moving party." *Jeffries,* 893 F.Supp. at 458 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

█ This court finds that a Rule 56(f) continuance is not warranted in this instance. As discussed at the June 16, 2000 hearing, much of the information sought

by the relief defendants may be obtained from a source other than the SEC. *See* Transcript at 5 (lines 5–22); 7–9. Several of the documents, such as this court's previous opinions, may be found in the Federal Supplement. Rose Antar, Sam M. Antar's wife, certainly could have obtained and submitted affidavits from herself and/or Sam M. Moreover, the SEC indicated at the hearing that it has made available to the relief defendants all documents and evidence in its possession pertaining to the issues relevant to this motion. Thus, because the relief defendants have had an opportunity to discover the pertinent information and much of the information may be obtained from a source other than the SEC, the relief defendants' motion for a continuance under Rule 56(f) is denied.

Next, the relief defendants argue that entry of summary judgment is inappropriate because there are genuine issues of material fact as to the relief defendants' liability on the SEC's claims. The SEC argues that although the relief defendants dispute several facts, none of the disputes qualifies as a genuine issue of material fact.

Pursuant to Rule 56(c), a motion for summary judgment will be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987). In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). All facts and inferences are construed in the light most favorable to the non-moving party. *See Peters v. Delaware River Port Authority of*

*Pa. and N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).

The substantive law will identify which facts are "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The party seeking summary judgment always bears the initial burden of production, *i.e.*, of making a *prima facie* showing that it is entitled to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that the moving party must prevail as a matter of law, or by demonstrating that the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. *Id.* at 322–23, 106 S.Ct. 2548. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. 2548.

However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.1993). Therefore, to raise a genuine issue of material fact, the summary judgment opponent " 'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.; see also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury

could reasonably find for the [nonmovant].").

It is clear, however, that if a moving party satisfies its initial burden of establishing a *prima facie* case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, "[t]here must ... be sufficient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994).

In the present case, the relief defendants argue that the SEC has not satisfied its initial burden of production with respect to its summary judgment motion. Therefore, the relief defendants contend that the burden never shifts to them to demonstrate the existence of specific facts that create a genuine issue of material fact. The SEC counters that it has met its burden of production and that the relief defendants raise no genuine issue of material fact in response.

Turning first to the SEC's claims under the Uniform Fraudulent Transfers Act ("UFTA"), this court finds that entry of summary judgment is appropriate with respect to the SEC's claim under N.J.S.A. § 25:2–27(a). In the Amended and Supplemental Complaint, the SEC set forth two claims under different subsections of the UFTA. First, the SEC invoked N.J.S.A. § 25:2–25, which provides that:

a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor

(1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

The SEC alleges that Sam M. Antar made the 1991 and 1997 transfers with the actual intent to hinder, delay, or defraud a creditor. In the Amended and Supplemental Complaint, the SEC submits that Sam M.'s fraudulent intent may be inferred because he made the transfers to an insider—his wife; he retained possession and/or control of the properties; he made the transfers after being sued by the SEC for millions of dollars and within months before the September 1997 trial; he made the other transfers shortly after being deposed in an action by the SEC against Sam M.'s son for the same securities fraud; the consideration, if any, that he received was not equivalent to the value of the properties transferred; and he was insolvent when he made the transfers. *See* N.J.S.A. § 25:2–26 (providing that facts such as these, if true, are proper bases for an inference of fraudulent intent).

Nonetheless, the relief defendants assert that there is a genuine issue of material fact with respect to Sam M.'s alleged fraudulent intent. In her 1998 deposition, Rose Antar stated that the asset transfers were made for "estate planning" purposes during a period when Sam M. was ill. She further stated that it was her idea for Sam M. to make the transfers. The SEC, however, does not seek entry of summary judgment on its claim under § 25:2–25. The SEC has stated that "[w]hile the SEC has alleged Sam M.'s intent to defraud creditors in its complaint, for purposes of

summary judgment the plaintiff relies solely on the statutory fraud provision [§ 25:2–27(a) ]." Reply Brief at 9. Thus, while this court believes that the factors listed above are *strongly* suggestive of Sam M.'s fraudulent intent and substantially undermine Rose's assertion that the transfers were made for estate planning purposes, entry of summary judgment on the § 25:2–25 claim is inappropriate.

■ The SEC asserts that it is entitled to entry of summary judgment on its other claim under the UFTA. N.J.S.A. § 25:2–27(a) provides that:

> a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Therefore, under § 25:2–27(a), the SEC must demonstrate that: (1) its claim arose before the transfers were made; (2) Sam M. made the transfers without receiving reasonably equivalent value; and (3) Sam M. was insolvent or became insolvent as a result of the transfers. Notably, actual intent to defraud is not part of this equation. *See Boardwalk Regency Corp. v. Burd,* 262 N.J.Super. 162, 164, 620 A.2d 448 (App.Div.1993). As such, the relief defendants' contention that the transfers were made only for estate planning purposes, and not to evade satisfaction of the SEC's claim, is not relevant to the SEC's claim under § 25:2–27(a). There is no dispute as to the first and second elements of the SEC's claim: the relief defendants do not dispute that the SEC's claim arose before the transfers were made and that Sam M. did not receive a reasonably equivalent value for the transfers. The relief defendants focus their argument on the third element; they contend that the SEC

has not demonstrated that Sam M. was insolvent at the time of the transfers.

The UFTA provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." N.J.S.A. § 25:2–23(a). A "debt" is defined as "liability on a claim." N.J.S.A. § 25:2–21. Further a "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* The SEC asserts that as result of its unliquidated securities fraud claim against Sam M., he was insolvent at the time of each and all of the 1991 and 1997 transfers. The fact that the SEC's claim had not yet been reduced to judgment does not undermine Sam M.'s insolvent status. *See id.*

It is now clear that the value of the SEC's unliquidated claim against Sam M. was, and is, approximately $15 million, exclusive of pre-judgment interest in the amount of approximately $42 million, as ordered by this court. *See SEC v. Antar,* 97 F.Supp.2d at 587–88. Because the SEC's claim was based on Sam M.'s securities fraud in the 1980s, Sam M. possessed this debt at the time of all of the 1991 and 1997 transfers. As for Sam M.'s net worth at the time of the transfers, the SEC points to Sam M.'s deposition testimony in 1995. Sam M. testified that his net worth was $8 million in June 1992 and $6 to $8 million in January 1995. *See* Simpson Dec. Exh. 17. The SEC submits that "in the absence of any evidence showing a significant positive change in his financial position in the years before or after that time [1992 and 1995], it is clear that his debts dwarfed any conceivable valuation of his assets in 1991 and 1997." Reply Brief at 8. Indeed, the relief defendants have presented no evidence that would enable a jury to find in their favor on the issue of Sam M.'s insolvency. The relief defendants have not presented even a scintilla of evidence that Sam M. was solvent at the time of the transfers. *See Anderson,* 477

U.S. at 252, 106 S.Ct. 2505 (holding that "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."); *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (holding that the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."). As such, the relief defendants have not demonstrated that there is a genuine issue of material fact on the issue of Sam M.'s insolvency such as would preclude entry of summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (holding that a factual dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 452 (3d Cir.1997).

Nevertheless, the relief defendants challenge the SEC's proof on the element of Sam M.'s insolvency. They contend that Sam M.'s testimony regarding his net worth in 1992 and 1995 is insufficient to support a finding of insolvency, particularly at the time of the 1991 transfers. The relief defendants argue that "it is incumbent on one who seeks to set aside a transfer to disclose that, at the time of the transfer, the transferor was insolvent or was thereby rendered insolvent." Relief Defendants' Brief at 29 (citing *Telefest, Inc. v. VU–TV, Inc.*, 591 F.Supp. 1368, 1376 (D.N.J.1984)). Moreover, "[i]t will not suffice to disclose that at some subsequent time the transferor was or became insolvent." *Telefest*, 591 F.Supp. at 1376. Thus, although the evidence of Sam M.'s net worth in 1992 and 1995 certainly supports the inference that he was insolvent at the time of the 1997 transfers, the relief defendants submit that the evidence does not support the inference that Sam M. was insolvent at the time of the 1991 transfers.

However, there are at least two significant distinctions between this case and the *Telefest* case. First, the non-movants in *Telefest* raised a genuine issue of material fact with respect to the defendant's insolvency during the relevant time period and successfully attacked the competency of the plaintiff's evidence. *See* 591 F.Supp. at 1375–77. In this case, the relief defendants have presented no evidence that casts doubt on the SEC's submission that Sam M. was insolvent. Rose Antar, Sam M.'s wife, would certainly have access to relevant information and would seem to have the ability to point to factors indicating Sam M.'s solvency, if such proof existed. Significantly, the relief defendants have presented no evidence suggesting that Sam M. was solvent at the time of either the 1997 or the 1991 transfers.

Second, the court in *Telefest* acknowledged that "[t]he nature of the business in which VU–TV was engaged, one that heavily relies on accounts receivable, together with its recordkeeping practices, make it peculiarly difficult to obtain the type of evidence that an accountant would need to accurately determine solvency as of a given date." *Id.* at 1374. There is no such difficulty in the present case. Determining the solvency of a private individual at a particular time is undoubtedly simpler than determining the solvency of a corporation which relies heavily on accounts receivable. The relief defendants do not dispute that at the time of the transfers, in 1991 and 1997, Sam M. was liable for at least $15 million on the SEC's claim against him. Sam M. has stated under oath that his net worth in 1992 was $8 million and his net worth in 1995 was $6 to $8 million. *See* Simpson Dec. Exh. 17. It is an absolutely reasonable and appropriate inference, especially in the absence of evidence to the contrary, that Sam M. was not worth twice those amounts either one year earlier [1991] or two years later [1997]. Surely, if Sam M. lost at least half of his net worth between 1991 and 1992, or doubled his net worth between 1995 and 1997, the relief defendants could produce some evidence of that event. However, the relief defendants produce no evidence that contradicts the SEC's proof that Sam

M. was insolvent at the time of both the 1991 and the 1997 transfers.

The relief defendants further assert that the SEC was not a "traditional creditor" at the time the transfers were made. *See* Relief Defendants' Brief at 31. The relief defendants submit that Sam M. had no knowledge that the SEC might seek recovery against him. First of all, Sam M.'s knowledge of the SEC's claim is wholly irrelevant. Second, the relief defendants' assertion strains the court's credulity, to say the least. The 1991 transfers were made shortly after Sam M. appeared for a deposition in the SEC's case against his son, Eddie Antar. In that deposition, Sam M. invoked his Fifth Amendment privilege against self-incrimination. This fact certainly supports the conclusion that Sam M. was aware of the SEC's potential claim against him. Sam M. was certainly aware of the SEC's claim against him when he made the 1997 transfers. Those transfers took place only a few months before the trial in this action. Therefore, not only was the SEC a creditor at the time of the transfers, Sam M. was likely aware of the SEC's claim against him.

This court notes that "the purpose of the fraudulent conveyance statute is to prevent insolvent debtors from placing their property beyond the reach of their creditors while at the same time enjoying the benefits thereof." *United States v. Jones*, 877 F.Supp. 907, 916 (quoting *United States v. Mazzara*, 530 F.Supp. 1380, 1383 (D.N.J.1982)). The relief defendants repeatedly assert that the transfers were made for estate planning purposes and to ensure that Rose and the Antar family always had a place to live. While this may be a legitimate motive for at least some of the transfers, that motive has no bearing on the elements of a fraudulent transfer claim under § 25:2–27(a). The facts remain that the SEC's claim arose before the transfers were made; Sam M. received little or no consideration for the transfers; and Sam M. was insolvent at the time of the transfers. Under these circumstances,

the fraudulent transfers must be set aside pursuant to §§ 25:2–27(a) and 25:2–29. *See also Jones*, 877 F.Supp. at 916. Although a specific finding on the issue of intent is not required, this court notes that several facts are strongly suggestive of Sam M.'s actual intent to defraud creditors: he made the transfers to an insider—his wife; he retained possession and/or control of the properties; he made the transfers after being sued by the SEC for millions of dollars and within months before the September 1997 trial; he made the other transfers shortly after being deposed in an action by the SEC against his son for the same securities fraud; the consideration, if any, that he received was not equivalent to the value of the properties transferred; and he was insolvent when he made the transfers. In light of these facts, the selfserving statements of Rose and Sam M. that the transfers were made simply for estate planning purposes are absolutely incredible. In any event, Sam M.'s motive in transferring the properties is irrelevant to the SEC's claim under § 25:2–27(a).

 The relief defendants make one additional attack on the SEC's evidence of Sam M.'s insolvency. They contend that Sam M.'s 1995 deposition testimony cannot be used against them because they were not parties to the action at the time the deposition was taken. The relief defendants rely on Rule 32(a) and *Tormo v. Yormark*, 398 F.Supp. 1159 (D.N.J.1975), in support of their argument that the deposition testimony is inadmissible against them. Rule 32(a) provides that "[a]t the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition ... may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof ..." In the very case cited by the relief defendants, however, the court held that "[d]espite this language [in Rule 32(a) ], courts and commentators have rejected the notion that the rule governs the use of deposition testimo-

446

ny at a hearing or a proceeding at which evidence in affidavit form is admissible." *Tormo,* 398 F.Supp. at 1168. The *Tormo* court found that Rule 32(a) does not demand that a person have been represented in order to have the deposition admitted against them, but rather, "that a deposition, like an affidavit, must satisfy Rule 56(e)'s requirement that it 'set forth such facts as would be admissible in evidence....'" *Id.* at 1169. Thus, under *Tormo,* the essential issue is whether the deposition sets forth facts that would be admissible in evidence. *See id.* The relief defendants have not challenged the admissibility of Sam M.'s statements during his deposition testimony. The fact that the relief defendants were not present or represented at the time of Sam M.'s deposition does not render the deposition testimony inadmissible.

Therefore, considering Sam M.'s 1995 deposition testimony and the failure of the relief defendants to present any evidence to the contrary, this court finds that there is no genuine issue of material fact as to Sam M.'s insolvency at the time of the 1991 and 1997 transfers.

■ The relief defendants also assert that the SEC has failed to establish with valid proofs the value of the transferred assets. They contend that Sam M. is not competent to testify about the value of his interests in the various properties. The relief defendants have cited several cases concerning the admissibility of lay opinion testimony in general, as well as the particular difficulty of determining the value of one's interest in a closely held corporation. *See Asplundh Mfg. Div. v. Benton Harbor Engineering,* 57 F.3d 1190, 1197–98 (3d Cir.1995); *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1175–76 (3d Cir.1993); *Bowen v. Bowen,* 96 N.J. 36, 49–50, 473 A.2d 73 (1984); *Lavene v. Lavene,* 148 N.J.Super. 267, 275–76, 372 A.2d 629 (App. Div.1977). Contrary to the relief defendants' suggestion, none of these cases stands for the blanket proposition that an owner can never testify concerning the value of his or her own property. Indeed, the court in *Asplundh* noted that lay testimony about the value of one's property is "quintessential Rule 701 opinion testimony." 57 F.3d at 1197–98. *Bowen* and *Lavene,* however, recognize that lay opinion testimony may not be sufficient to establish the value of one's interest in a close corporation. *See* 96 N.J. at 49–50, 473 A.2d at 79–80. In any event, the SEC correctly responds that N.J.S.A. § 25:2–27(a) does not require proof of the value of the transferred assets. The SEC has met its burden of proving the elements of its fraudulent transfer claim under § 25:2–27(a); the value of the properties transferred may be determined by an independent appraiser at a later time, if necessary. The value of the properties is not relevant to the SEC's motion for summary judgment.

Therefore, it is apparent that the relief defendants have presented nothing more than a "metaphysical doubt" as to the elements of the SEC's fraudulent transfer claim under N.J.S.A. § 25:2–27(a). *See Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (holding that the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."). As such, the SEC's motion for entry of summary judgment against the relief defendants is granted.

Next, the relief defendants assert that the SEC's equitable claims against them for unjust enrichment and constructive trust are untenable. The relief defendants again argue that the relevant assets must be traceable to a wrongful act in order to be subject to constructive trust. The SEC responds that there is no requirement of traceability associated with claims of unjust enrichment and constructive trust. Indeed, the cases cited by the relief defendants do not support the existence of a broad traceability requirement. Several of the cases relate to recovery of illegal profits under the securities laws, as discussed earlier in this opinion. *See infra* pp. 436–38; *Cherif,* 933 F.2d at 414 n. 11; *Com-*

modity Futures Trading Comm'n v. Hanover Trading Corp., 34 F.Supp.2d 203, 206–08 (S.D.N.Y.1999); *SEC v. Pinez*, 989 F.Supp. 325, 339 (D.Mass.1997); *SEC v. United Communications, Ltd.*, 899 F.Supp. 9, 11–12 (D.D.C.1995); *SEC v. Egan*, 856 F.Supp. 401, 402 (N.D.Ill.1993); *see also United States v. Cannistraro*, 694 F.Supp. 62, 72 n. 11 (D.N.J.1988), *vacated on other grounds*, 871 F.2d 1210 (3d Cir. 1989). At most, these cases hold that, *under the securities laws*, the court may be limited to reaching assets that are fruits of the securities fraud.[2] None of these cases pertains to equitable claims such as the SEC's, which are asserted in connection with fraudulent transfer claims under the court's ancillary enforcement jurisdiction. As such, these cases are inapposite. Moreover, none of the cases is binding on this court.

 A constructive trust is a remedial device of equity. In other words, "[a] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." *Stewart v. Harris Structural Steel Co., Inc.*, 198 N.J.Super. 255, 266, 486 A.2d 1265 (App.Div.1984) (quoting *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378 (1919) (Cardozo, J.)). The Supreme Court of New Jersey has held that "[g]enerally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, unde influence ... which has resulted in a transfer of property." *D'Ippolito·v. Castoro*, 51 N.J. 584, 589, 242 A.2d 617 (1968). In this case, contrary to the relief defendants' contention, the property sought to be subject to constructive trust is traceable to a wrongful act. The relief defen-

dants only possess the assets as a result of Sam M.'s illegal and fraudulent transfer of that property. The relief defendants assert that they themselves did not engage in any fraudulent activity; rather, their intentions were simply estate planning. However, even if the relief defendants's assertions are truthful, "[a] constructive trust may arise ... even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it." *D'Ippolito*, 51 N.J. at 589, 242 A.2d 617 (citing Scott on Trusts § 462.2, p. 3417 (3d ed.1967)); *Coney v. Coney*, 207 N.J.Super. 63, 74–75, 503 A.2d 912 (Ch.Div.1985); *Stewart*, 198 N.J.Super. at 265–66, 486 A.2d 1265 (holding that "[i]t is fundamental that a constructive trust should 'be impressed in any case where to fail to do so will result in an unjust enrichment'" (citations omitted)); *Callahan v. Callahan*, 142 N.J.Super. 325, 361 A.2d 561, (Ch.Div.1976) (stating that "[i]n the past, fraud has been thought to be an essential element of a constructive trust ... But a court of equity is not so limited today." (citations omitted)). Even the cases cited by the relief defendants recognize that a constructive trust may be imposed whenever a person is unjustly enriched. *See Pinez*, 989 F.Supp. at 339; *Egan*, 856 F.Supp. at 402; *Cannistraro*, 694 F.Supp. at 72 n. 11. Therefore, the touchstone for imposition of a constructive trust is unjust enrichment, regardless of whether a wrongful act was committed. A showing of traceability is not required.

 Moreover, the UFTA expressly recognizes the availability of equitable remedies against debtors who engage in fraudulent transfers. *See* N.J.S.A. § 25:2–29. Among other remedies, a creditor may obtain "(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim ... (3)(a) An injunction against further disposition by

---

2. The other case cited by the relief defendants, *Alsco–Harvard Fraud Litigation*, 523 F.Supp. 790, 806–07 (D.D.C.1981), holds that

a constructive trust may only be imposed when the party receives the property in connection with a wrongful act.

the debtor or transferee, or both, of the asset transferred or of other property; (b) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or (c) Any other relief the circumstances may require." N.J.S.A. § 25:2–29. Thus, this court may impose equitable remedies such as constructive trust in connection with fraudulent transfer claims. *See also In re Halpert & Co., Inc.*, 254 B.R. 104, 120 (Bkrtcy.D.N.J. Feb. 25, 1999).

■ Indeed, the Third Circuit has held that a transferee of a fraudulent conveyance holds only legal title to the conveyed property, and it holds that title subject to a constructive trust for the benefit of the transferor's creditors. *See Voest–Alpine Trading U.S.A. Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 216–18 (3d Cir.1990); *see also Gov't Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 5 F.Supp.2d 324, 335 (D.Vi.1998); *In re Foxcroft Square Co.*, 184 B.R. 671, 674 (E.D.Pa.1995); *Petersen v. Vallenzano*, 849 F.Supp. 228, 233 (S.D.N.Y.1994). In *Voest–Alpine*, plaintiff VATCO sold steel to the Paige Group, a group of steel fabrication companies whose sole shareholders were Marvin and Holly Stabler. *See* 919 F.2d at 208. When the Paige Group failed to pay for the steel, VATCO brought suit and obtained a judgment in the amount of $452,307.15. *See id.* at 208–09. Shortly after VATCO moved for summary judgment in that suit, Marvin and Holly Stabler orchestrated a series of transactions in which the Paige Group's assets were transferred to a new corporation called Vantage, which the Stablers formed. *See id.* at 209. This transfer prevented VATCO from collecting its judgment against the Paige Group. *See id.* The district court found that the transfer was fraudulent under both P.S.A. § 357 (actual intent) and P.S.A. § 354 (constructive intent).[3] *See id.* at 214. In light of this

finding, the Third Circuit held that "to the extent that the Stablers possess any equity interest in Vantage which they received as a result of Vantage's acquiring Paige's inventory at less than fair consideration, the Stablers have been unjustly enriched at the expense of Paige's unsecured creditors." *Id.* at 218. The Court of Appeals then approved the district court's decision to remedy the unjust enrichment by establishing a constructive trust in favor of the unsecured creditors. *See id.*

■ Similarly, in the present case, this court has found that no genuine issue of material fact exists as to whether Sam M.'s transfers to the relief defendants were fraudulent. This court has concluded that the transfers were fraudulent under N.J.S.A. § 25:2–27(a). Moreover, the court again notes the abundance of evidence indicating Sam M.'s actual intent to defraud his creditor, the SEC. The 1991 transfers were made shortly after Sam M.'s deposition in the SEC's case against his son for securities fraud. At the deposition, Sam M. invoked his Fifth Amendment privilege against self-incrimination. The 1997 transfers occurred shortly before the trial against Sam M. in this matter. The transfers were made in exchange for little or no consideration. Also, like the transferors in *Voest–Alpine*, Sam M. continues to benefit from and enjoy several of the transferred assets, such as the marital home and the vacation home. In any event, although summary judgment has not been entered under § 25:2–25, the fraudulent nature of Sam M.'s conveyances is beyond dispute under § 25:2–27(a).

Thus, in accordance with the court's holding in *Voest–Alpine*, this court may establish a constructive trust with respect to the fraudulently transferred assets. There is no requirement that the transferred assets be traceable to Sam M.'s securities fraud. Moreover, contrary to the relief defendants' assertion that Sam

---

**3.** These statutes are essentially identical to N.J.S.A. § 25:2–25 (actual intent) and

N.J.S.A. § 25:2–27(a) (constructive intent).

M. "did not transfer any property to which the SEC was entitled, now or then," Relief Defendants' Brief at 9, the relief defendants have in fact been unjustly enriched at the expense of the SEC's judgment against Sam M. If the assets were not transferred, they could have been used to satisfy the SEC's judgment. Thus, regardless of the professed innocent intent of the relief defendants, it would be manifestly unjust to permit the relief defendants to retain assets which have been fraudulently transferred to them and which should be applied to the SEC's judgment against Sam M. for securities fraud. Moreover, imposition of a constructive trust is necessary in this case to ensure that the assets are not again fraudulently transferred or otherwise illegally dissipated. Therefore, in addition to avoidance of the fraudulent transfers, this court will order that the assets in question be held in constructive trust in favor of the SEC.

Finally, the relief defendants assert that if this court decides to place the assets in a constructive trust, it would be an unnecessarily harsh penalty to place into that constructive trust assets that were previously owned by Rose and Sam M. as tenants by the entirety. Specifically, Sam M. and Rose owned the marital residence in West End, New Jersey and a vacation home in Dade County, Florida as tenants by the entirety. The relief defendants submit that based on considerations of fairness, and the special status of tenancies by the entirety, the marital home and the vacation home should not be placed in constructive trust. The SEC "puts aside" the question of whether partition of the marital home would be a harsh penalty, but argues that partition of the vacation home is certainly not a harsh penalty. See Reply Brief at 9 n. 3.

In support of their argument, the relief defendants rely substantially on the court's rationale and holding in United States v. Jones, 877 F.Supp. 907 (D.N.J.1995). That case is indeed factually similar to the case at hand. There, as here, the debtor spouse transferred property to his wife for minimal consideration, in violation of New Jersey's statute governing fraudulent conveyances.[4] See Jones, 877 F.Supp. at 915–16. As in the present case, the transfer was set aside as a fraudulent conveyance and the spouses were returned to their status as tenants by the entirety. See id. at 916. The creditor in Jones then sought foreclosure of the marital home to satisfy its claim against the debtor spouse. See id. at 916. Here, the SEC has not yet sought partition or foreclosure on the transferred properties. Rather, Sam M.'s interests in the previously transferred properties will be placed in constructive trust. Nevertheless, as discussed below, the court will not permit foreclosure or partition of the marital home, which was previously held by Sam M. and Rose as tenants by the entirety.

 It is well established that a debtor's interest in property held as tenant by the entirety may be reached by the debtor's creditors. See Newman v. Chase, 70 N.J. 254, 262, 359 A.2d 474 (1976). Several New Jersey courts have addressed the particular way in which a creditor of one spouse may levy against that spouse's interest in a tenancy by the entirety. See ESB, Inc. v. Fischer, 185 N.J.Super. 373, 448 A.2d 1030 (Ch.Div.1982); Newman, 70 N.J. 254, 359 A.2d 474. A tenancy by the entirety vests each spouse with an undivided one-half interest in the property and a right of survivorship. See ESB, Inc., 185 N.J.Super. at 379, 448 A.2d 1030. The spouses hold the property as tenants in common during their joint lives and own a right of survivorship entitling each to become the sole owner of the property upon the death of the other spouse. See Newman, 70 N.J. at 259, 359 A.2d 474. "[D]uring coverture each [spouse is] seized of the

---

4. The statute applied by the court in Jones was § 25:2–10 of the New Jersey Fraudulent Conveyance Act. See 877 F.Supp. at 914–16. That statute was the substantial equivalent of its successor, the current § 25:2–27(a) of the New Jersey Fraudulent Transfers Act.

indivisible whole of the property." *Id.* at 262, 359 A.2d 474. As such, tenancies by the entirety operate to protect marital assets during coverture and as security for a spouse upon the death of the other. *See Jones,* 877 F.Supp. at 917. New Jersey courts are thus reluctant to permit interference by creditors with property owned as a tenancy by the entirety, especially where the property is a marital home. *See Freda v. Commercial Trust Co. of N.J.,* 118 N.J. 36, 46, 570 A.2d 409 (1990); *Newman,* 70 N.J. at 265–66, 359 A.2d 474. Fairness dictates that a family not be dispossessed of its home as a result of one spouse's debts.

On the other hand, New Jersey courts have not held that creditors are never entitled to obtain partition of property held as a tenancy by the entirety. Indeed, "[t]here is no limit to the value of real property which can be held by husband and wife as tenants by the entirety. Were partition to be automatically denied, there might well be situations in which a debtor would thus be afforded 'opportunity to sequester substantial assets from just liabilities.'" *Newman,* 70 N.J. at 266, 359 A.2d 474 (quoting *Way v. Root,* 174 Mich. 418, 140 N.W. 577 (1913)). Thus, a court is permitted to exercise its equitable discretion in deciding whether to allow partition or foreclosure. *See Newman,* 70 N.J. at 264, 359 A.2d 474. For instance, the court in *Newman* found that where a bankrupt husband lives with his young family in a modest home, a court may exercise its discretion to deny partition and leave the creditor to resort to some other remedy. *See* 70 N.J. at 266, 359 A.2d 474. In *Jones,* the court determined that dispossessing an unemployed wife and her young son of the family home in order to satisfy a debt owed by her husband would be "a grossly unfair solution and one that violates New Jersey's policy of protecting the marital home." 877 F.Supp. at 918.

In the present case, the court finds that remedies of foreclosure and partition are inappropriate with respect to the marital home located in West End, New Jersey. This court acknowledges the SEC's strong interest in satisfying its judgment against Sam M. However, the SEC's judgment is against Sam M. only. Forcing dispossession of the marital home, held as a tenancy by the entirety, would be, as the relief defendants argue, a harsh penalty. The equities of the present situation dictate that, as long as Rose Antar's right of survivorship remains intact, the SEC may not satisfy its judgment against Sam M. by forcing foreclosure or partition of the marital home. However, the equities do not dictate that the SEC is forbidden from seeking foreclosure or partition of the vacation home in Dade County, Florida. Partition of a vacation home does not implicate New Jersey's strong interest in protecting marital homes. Moreover, this court is ever aware that tenancies by the entirety may be employed in order to frustrate one spouse's creditors. *See Newman,* 70 N.J. at 264, 359 A.2d 474. In light of this potential for abuse, and the fact that the property in Florida is not a traditional marital home, this court does not find that such property is necessarily exempt from foreclosure or partition.

Further, as discussed in *Jones, Newman,* and *ESB, Inc.,* the SEC is not entirely without a remedy with respect to the marital home. If the SEC levies against Sam M.'s interest in the marital home, the SEC and Rose will become tenants in common in the property for the joint lives of Sam M. and Rose. *See Jones,* 877 F.Supp. at 920; *Newman,* 70 N.J. at 261, 359 A.2d 474. Since the SEC will not be able to occupy the home jointly with Rose, "equity requires that the cotenant in possession make appropriate payments to the cotenant out of possession." *Jones,* 877 F.Supp. at 920; *see also Newman,* 70 N.J. at 267–68, 359 A.2d 474. As such, Rose may be required to pay half of the rental value of the home to the SEC and the SEC would apply such amounts to the judgment against Sam M. In this way, Rose would be permitted to continue occupying the

marital home and the SEC would be provided with some satisfaction of its judgment against Sam M.

Therefore, for all of the reasons expressed in this opinion, the SEC's motion for summary judgment is granted. The fraudulent transfers are voided and the following assets will be disgorged or placed in constructive trust in accordance with this opinion: (1) Sam M. Antar's 25 percent interest in S & E Realty Partnership; (2) the former family residence at 2146 East Third Street in Brooklyn, New York; (3) Sam M. Antar's 50% interest in S & E Realty, Inc.; (4) Sam M. Antar's interest in his residence at 717 Ocean Avenue, Unit No. 710, and Cabana No. 46, West End, New Jersey; (5) the commercial property located at 2155 route 22 West in Union, New Jersey; (6) Sam M. Antar's interest in a condominium at 19667 Turnberry Isle South, Units Nos. 18–D and CA–11, in Dade County, Florida; (7) securities worth $464,879 which were transferred from Sam M. Antar's brokerage account at Shearson Lehman Brothers to a brokerage account in Rose's name on March 15 and 18, 1991; (8) securities worth $912,728 which were transferred from Sam M. Antar's brokerage account at Oppenheimer & Company to a brokerage account in Rose's name on October 16 and 17, 1991; (9) securities worth $333,275 which were transferred from Sam M. Antar's brokerage account at Shearson Lehman Brothers to a brokerage account in Rose's name on October 17, 1991; (10) the value of Sam M. Antar's interest in the property located at 51 Columbia Place, Brooklyn, New York. The SEC, however, shall not be entitled to foreclosure or partition of the marital home in West End, New Jersey so long as Rose's right of survivorship remains intact.